PITTSTON COMPANY, et al., Plaintiffs,

v.

ALLIANZ INSURANCE COMPANY, et al., Defendants.

Civ. A. No. 90–3631.

United States District Court,
D. New Jersey.

Aug. 25, 1995.

David J. Farber, Timothy A. Vanderver, Jr., Paul A.J. Wilson, Patton Boggs, Washington, DC and Dennis J. Drasco, Kevin O'Connor, Lum, Danzis, Drasco, Positan & Kleinberg, Roseland, NJ, for Plaintiff, The Pittston Company.

Sherry Ward Gilbert, Robert P. Jacobs, Christopher H. Marraro, Howrey & Simon, Washington, DC and John M. Agnello, Carrella, Byrne, Bain, Gilfillan Cecchi, Stewart & Olstein, Roseland, NJ, for Intervenor/Plaintiff, Ultramar.

Robert Bell, Joseph L. Ruby, Wiley, Rein & Fielding, Washington, DC and Douglas Arpert, Evans, Hand, Allabough & Amoresano, West Paterson, NJ, for Defendant Travelers Insurance Co.

William B. McGuire, John J. Henschel, Tompkins, McGuire & Wachenfeld, Newark, NJ, for Defendant Hartford Insurance Co.

Frances Buckley, Neal M. Glazer, D'Amato & Lynch, New York City and James A. Scarpone, Hellring, Lindeman, Goldstein & Seigal, Newark, NJ, for Ultramar London Insurers.

Wm. Gerald G. McElroy, Jr., Natalie Monroe, Zelle & Larson, Waltham, MA and Philip Hunsucker, Zelle & Larson, San Francisco, CA and William S. Wachenfeld, Mendes & Mount, Newark, NJ, for Defendant Employees Ins. of Wausau.

George Daly, Stacey Tranchina, Timothy Lennon, Donald T. Rave, Jr., Bigham, Englar, Jones & Houston, New York City, for Defendants Hartford, Allianz, AMIG and others.

Bruce R. Grace, Martin R. Baach, Nussbaum & Wald, Washington, DC, for London Insurers on Pittston policies.

Karen M. Hoerrner, John L. Altieri, O'Melveny & Myers, Newark, NJ, for Defendant INA.

Edward G. Madden, Jr., Mark L. Czyz, Angelo A. Cuonzo, Mattson & Madden, Newark, NJ, for Defendant Protective Ins. Co.

Michael B. McCauley, Palmer, Biezup & Henderson, Camden, NJ and Alfred J. Kuffler, Kevin G. O'Donovan, Palmer, Biezup & Henderson, Philadelphia, PA, for Various Lloyds Underwriters & Marine Insurers.

## TABLE OF CONTENTS

BACKGROUND ................................................. 1288

DISCUSSION ................................................. 1292

 1. The Summary Judgment Standard ......................... 1292
 2. The Travelers CGL Policies ............................. 1293

 A. Voluntary Assumption of an Obligation .................... 1293
 B. Damages ............................................. 1297
 C. The Continuous Trigger ................................ 1297
 D. "Expected nor Intended" as an Element of Coverage ...... 1300
 E. Defenses to Coverage ................................. 1311

 (i) Late Notice and Defense Costs ...................... 1311
 (ii) Pollution Exclusion Clause ........................ 1312
 (iii) Owned Property Exclusion ......................... 1316

 F. The Fortuity, Known Loss and Loss in Progress Doctrines ....... 1317
 G. Summary ............................................. 1318

 3. The Other Insurers ..................................... 1318

 A. CMLP Policies ....................................... 1318
 B. The Protective Insurance Company's Motion .............. 1327
 C. The Insurance Company of North America ("INA") Motions ....... 1327

 (i) The Named Insured Issue .......................... 1327
 (ii) The Fortuity, Known Loss, and Loss in Progress Issue ............ 1329

CONCLUSION ................................................. 1332

APPENDIX ................................................... 1332

MAP OF TANKPORT TERMINAL, JERSEY CITY, N.J. .................... 1334

## OPINION

WOLIN, District Judge.

## BACKGROUND

As our body politic has come to grips with the legacy of an earlier, less environmentally enlightened time, certain issues have been settled and become features of our legal landscape. There is now broad consensus that the users of industrial sites who profited by them in the past must now take responsibility for their remediation. *See, e.g.,* Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 et seq.; New Jersey Environmental Cleanup Responsibility Act ("ECRA"), N.J.S.A. 13:1K–6 et seq. As this primary issue has been resolved, secondary ones have taken their place.

Such an issue is presented by this case; what is the liability of insurers who wrote traditional policies of liability and marine insurance over the years to industries now faced with the task of bringing these sites up to modern standards of environmental safety? As will be seen below, this issue is well on its way to joining the underlying questions of clean-up responsibility as a settled area of the law. Nonetheless this Court is regularly required to adjudicate coverage disputes between policyholders and insurers who are reluctant to ameliorate the wrongs of the past.

This case involves a former oil transfer terminal on the western shore of upper New York Harbor in Jersey City, New Jersey. The involvement with the oil industry of this parcel of tideland dates to the dawn of the petroleum age. It was known as the Eagle Works Refinery when John D. Rockefeller acquired it in 1881. Ralph W. Hidy & Muriel E. Hidy, *Pioneering in Big Business: History of Standard Oil (New Jersey) 1882–1911*

50 (1955). It was listed as one of the initial assets of Standard Oil of New Jersey. *Id.* Eagle Works had itself been built around equipment brought from the Pennyvania oil fields, the site of the first commercial exploitation of petroleum in history. *Id.* at 5.

By 1911, Eagle Works was the largest manufacturer of petroleum-based lubricants on earth, *id.* at 713, processing over 11,000 barrels of crude oil a day. *Id.* at 414. By 1920, however, the rise of the Texas oil fields undermined the economic advantage of east coast refineries, and Eagle Work's production began to decline. George S. Gibb & Evelyn H. Knowlton, *The Resurgent Years: History of Standard Oil Company (New Jersey) 1911–27* 560–61 (1956). Thus, before the middle of this century, the site had begun to pass into obsolescence. Standard Oil abandoned Eagle Works as antiquated in the 1930's, dismantled the refining equipment, but left some of the tanks and pipelines. Kaulaikis Dep. at A1786;[1] B390.

The western and southern ends of the Eagle Works site, *see* B1981, were purchased by Pittston for use as a marine oil terminal in 1954 and given the name Tankport. This area of the old refinery was dominated by large storage tanks, *id.,* and it was for storage and transfer of fuel oil that Pittston intended to use the site. Some of the Eagle Works tanks remained and were put back into service by Pittston. Kaulakis Dep. at A1790. An oil/water separator that is the source of much controversy in this case appears on an old map of the Eagle Works plant, *id.,* and the Court presumes that this was a pre-existing structure taken over by Pittston. The Court has appended a map, compiled from various exhibits submitted by the parties, for the guidance of the reader.

Tankport is on a very low lying piece of land. At places the surface of the ground is

---

1. In addition to numerous affidavits and declarations submitted in direct support of the motions, the parties have submitted a joint appendix that consists of more than twenty-five looseleaf volumes. Page citations to this record are preceded by capital letters A through D. Citations preceded by the letter "A" are to deposition transcripts. In the interest of space, the Court will not follow the usual practice of explaining the role of each deponent in this litigation when he or she is first cited, unless it is particularly relevant. Instead, the reader is referred to the appendix, *infra,* which sets forth a list of the "dramatis personae," their position, and relevant dates. Citations preceded by the letter "B" are to deposition exhibits. "C" connotes an insurance policy. "D" citations are to unreported decisions submitted by the parties.

within inches or even below the water table; at most it rises less than twenty feet. A creek known as Caven Creek runs along one side of the property. Access to the pier where the oil barges unload is by right of way across a piece of land owned by the Central New Jersey Railroad. The discharge from the oil/water separator arrives at the Creek through a drainage ditch.

That Tankport had suffered significant environmental degradation well before Pittston took it over may be readily imagined. The very large volume of oil processed and transshipped through the site under the rudimentary or non-existent environmental safeguards that characterized the industry early this century must necessarily have left its mark. *See* Kaulakis Dep. at A1830–32 (state of the art for oil refineries in the early days of the oil business caused leakage). The record shows that buried pipelines still filled with oil from the Eagle Works days lay forgotten in the ground. Stendardi Dep. at A2852. An expert retained by defendant Travelers Indemnity Company testifies that there was an oil sheen visible in the water surrounding Tankport in aerial photographs taken from the 1940's onward. Robertson Decla. Long-time employees report seeing oil stains on the ground in the 1940's. Shivey Dep. at A2672–73. This was the site that, in 1961, defendant Travelers Indemnity Company decided to insure.

Travelers' policies in this case are what is known as Comprehensive General Liability ("CGL") policies. Each ran for a year and was renewed each year. From 1961 to 1967, the policies were "accident based," that is they obliged Travelers:

> To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.

C365–1764 (CGL Master Policy File). By endorsement, and in 1967 in the policy itself, the term "accident" was replaced with "occurrence," a term of art whose meaning will be explored *infra*. The policies contain typical notice and owned-property exclusions. Starting in 1971, the policies began to contain pollution exclusion clauses. The issue of whether there is an occurrence triggering coverage in this case, and whether the various exclusion clauses and requirements of the policies apply here are heatedly debated.

From 1978 to 1984, Pittston purchased Comprehensive Marine Liability Package ("CMLP") policies from the defendant Marine Insurers.[2] The chief distinction between these and the CGL policies is that the CMLP policies cover a list of clearly marine risks, although there is dispute about whether there is coverage for other, non-marine risks and whether certain losses may be characterized as marine. These policies too have various exclusions and requirements that contribute to the substance of this dispute.

In June of 1980, the CMLP insurers added a clause to their policy excluding coverage for any damage for which indemnification was "payable" under any CGL policy. As of the beginning of 1981, Pittston canceled its Travelers CGL policy and replaced it with policies provided by the Protective Insurance Company. The CMLP insurers now contend that the Protective policies are CGL policies within the meaning of their CGL exclusion. Pittston argues that they are "fronting" insurance. Fronting insurance is a method of self-insurance by which the insured sets up a captive corporation that issues a policy to the parent. Pittston claims that the Protective policies are not true insurance at all, much less CGL insurance as designated under the CMLP policies.

Throughout the time of its ownership of Tankport, Pittston used it as an oil storage and transfer facility. Oil arrived by barge at the attached pier, was stored in the tanks, and then pumped into tank trucks for delivery to consumers in New Jersey. Pittston's awareness of the environmental impact of its operations is a key fact in this litigation, and the pertinent details will be discussed below.

2. The Marine Insurers are Allianz Ins. Co., American Marine, Underwriters ("AMU"), Ancon Ins. Co., Chiyoda Fire & Marine Ins. Co., Gibbs & Companies, Hartford Fire Ins. Co., Lloyds Underwriters on FSJ100–4/83, Rochdale Ins. Co., Unigard Mut. Ins. Co., Unione Italiana Reinsurance Co., United Americas Ins. Co., and Wausau.

Certain events took place in this regard however that will inform the reader at the outset.

Pittston claims that the tanks were subject to routine maintenance and cleaning throughout its tenure at Tankport. A system of monitoring of the tanks was used to detect loss of product. In 1974, Pittston was required to apply to the Environmental Protection Agency ("EPA") for a National Pollutant Discharge Elimination System Permit ("NPDES") pursuant to the Clean Water Act. B709–10. No response was received from the EPA until 1980 when a draft permit was issued and no final permit was issued as of the last policy period at issue in this litigation. Coleman Dep. at A672.

Pittston was also required in 1974 to file a Spill Prevention Control and Countermeasure ("SPCC") plan with the EPA. In 1979, this program was taken over by the State of New Jersey and Pittston filed a "Discharge Prevention Containment and Countermeasure ("DPCC") Plan and a Discharge Cleanup and Removal ("DCR") plan with the New Jersey Department of Environmental Protection and Energy ("NJDEPE"). B327–412.

Pittston admits to three major spill incidents during its time at Tankport.[3] The first was in September of 1976 when a pipe coupling broke during the transfer of oil. Two hundred ninety-one thousand gallons spilled into a containment dike around a tank. Pittston notified the EPA, the Coast Guard and NJDEPE. Pittston officers testify that they cleaned up the spill and disposed of contaminated surface soils off site. Coleman Dep. at A598; Dalton Dep. at A1021–22; B177–78.

In the winter of 1980, 200 gallons of fuel oil were spilled onto the ground. Pittston provides evidence that authorities were notified, and that it was cleaned up by an outside contractor. Coleman Dep. at A603–04; B179.

The last incident occurred sometime between 1981 and 1983. The daily inventory gauging of the tanks indicated that one tank was losing product. The loss was traced to a pipeline connected to the tank. Workers excavated the pipeline and discovered a small hole. Pittston officials testify that they dug trenches to collect the oil which was removed by vacuum trucks, absorbent pads and oil booms. Stendardi Dep. at A2846–51.

During the excavation to find the leak, workers discovered pipes that had been abandoned by the Eagle Works refinery. These pipes were a contributing source to the oil found in the ground in that area. Stendardi Dep. at A2852. This was not the only time abandoned Eagle Works equipment had been discovered. In 1976, an old drainage trap was discovered in the same general area as the leak in the 1980's. Pittston was alerted to the drainage traps' existence by oil leaching in the vicinity. Coleman Dep. at A605–06, A608; B180.

In approximately 1980, the Coast Guard detected leaching from the shoreline in the same area. It was determined that it was lubricating oil of a type that Pittston had never handled. Also in the early 1980's several tanks were removed from the site. In connection with this work and by digging in the area to locate unused pipelines, several pipelines were discovered that contained product foreign to the Pittston operation. Stendardi Dep. at A2772–74, A2889–91. In May 1983, investigation of a puddle of oil in the tank truck loading area led to the discovery of six more abandoned Eagle Works pipelines.

In each case, Pittston maintains that it engaged in the appropriate remedial conduct. For example, it drained and removed the derelict pipelines. The drainage trap was filled with cement and the area excavated in 1983 was "skimmed on a regular basis 'to collect any oil in the soil.'" Plaintiff's 12G Statement ¶ 269 (citing B183–84).

Pittston contends that, although it was the subject of repeated inspection from regulatory authorities, it was never found to be in violation or subjected to any sanction for pollution. Defendants dispute this and likewise dispute Pittston's assertions as to the effectiveness of the spill clean up efforts. Defendants characterize Pittston's regulatory filings as an acknowledgment to governmental authorities that there was petroleum pollution and a promise to remediate the site.

---

3. The record documents a total of eleven "spill incidents." B175–90.

*See* Marine Insurers Brief on Known Loss at 14.

Certainly by the mid to late 1970's there was concern at Pittston as to the future of Tankport, triggered at least in part by environmental problems there. In 1979, Pittston commissioned a pollution study from an environmental firm, Environics. The Environics report, B2286–2390, finds numerous examples of obvious oil contamination, including free floating oil in standing water, in soil samples and on vegetation in Caven Point Creek. Further tests were conducted. Through test wells and an analysis of exposed groundwater, Pittston learned that Tankport was substantially contaminated with oil in excess of regulatory allowances. B2325; B2332.

It appears from internal correspondence that, from an operational standpoint, Tankport was no longer an optimum location for Pittston. Other Pittston terminals were more efficient and less troublesome. Additionally, there was a problem with the right of way to the pier. Finally, it appears that there was a growing management awareness, received both from its own employees and from outside sources, that something would have to be done about the petroleum contamination of the site if it were to be a viable base of future operations over the long term.

For whatever reason, Pittston decided that Tankport was no longer worth the investment and, on April 30, 1983, the site was sold to plaintiff-intervenor Ultramar America. The transaction was effected by a purchase of all the stock of the subsidiary, Pittston Petroleum to Ultramar. The stock purchase agreement contained important provisions concerning the condition of the site. These appear to create an obligation in Pittston to indemnify Ultramar for damages caused by contamination of the site during Pittston's ownership of it. Because the interpretation of these terms are important to the question of whether Pittston had an insured loss, that interpretation is another focus of this litigation.

In 1984–85, Ultramar commissioned a study by the Killam Company, an environmental consultant, to determine what it would take to put Tankport on an environ-

mentally sound footing to operate as an oil terminal. The results of this study apparently led Ultramar to decide to close the site for good. In 1985, Ultramar filed an initial ECRA submission indicating its intent to decommission the site. B1849–1921.

In November of 1988, Ultramar filed suit against Pittston under the stock purchase agreement's indemnification clause alleging that the site was contaminated with chromium. That suit has since settled and is not connected to this dispute. However, in August of 1989, Ultramar circulated a draft amended complaint in the chromium litigation alleging that Pittston was liable to it for costs associated with petroleum contamination. In December of that year, the NJDEPE notified Ultramar that closing the site would make it liable for clean up costs under ECRA. Declaration of Farber, Exhibit B. Ultramar proposed a final clean up plan in February of 1990. B2048–2142.

Pittston gave notice to Travelers of Ultramar's claim by letter on April 4, 1990. The letter enclosed a proposed settlement agreement. The notice asked for a quick decision on coverage, because of impending motions in the Ultramar action. Five days later, on April 9, 1990, Ultramar and Pittston settled the question of liability for the clean up between them, with Pittston agreeing to pay 80% and Ultramar agreeing to pay 20% of the total cost. Travelers responded by letter dated April 12 which purports to waive objection to the settlement as a voluntary assumption of obligation, but reserves its other rights to dispute coverage. The letter stated that the insurer did not have enough time to take an definite position on coverage and that further investigation would be necessary.

The current condition of this long-suffering piece of ground is obviously not good. It is undisputed that there is significant soil contamination at Tankport. Three underground pools of oil have been discovered floating on top of the groundwater. Roland Decla. ¶ 25–28. Contaminated groundwater is migrating off-site. *Id.* ¶ 20–22. Seepage related to an oil/water separator has contaminated the soil, and its discharge has fouled Caven Creek. According to the Environics report, oil has

seeping into Caven Creek and into Upper New York Harbor.

The insurers denied coverage, and Pittston brought suit for a declaration of coverage. Ultramar has joined as an intervenor-plaintiff and its insurers are in the suit as well. Sixteen motions have been filed. The insurers and the insureds all move for summary judgment against each other. Many issues are common to more than one defendant or plaintiff. Where the discussion below may be pertinent to more than one motion it will be noted.

## DISCUSSION

### 1. The Summary Judgment Standard

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Whether a fact is "material" is determined by the substantive law defining the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons*, 871 F.2d 409, 419 (3d Cir.1989).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *Id.* Further, when a non-moving party who bears the burden of proof at trial has failed, in opposition to a motion for summary judgment, to raise a disputed fact issue as to any essential element of his or her claim, summary judgment should be granted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

When, the non-moving party will bear the burden of proof on a particular issue at trial, the moving party's burden can be "discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

When the non-moving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511. "The mere existence of a scintilla of evidence will be insufficient." *Id.* at 252, 106 S.Ct. at 2512. The inquiry is whether, "seen through the prism of the substantive evidentiary burden," a reasonable jury could render a verdict for the burdened non-movant. *Id.* at 254–55, 106 S.Ct. at 2513–14. Thus, in this case, plaintiff must make a showing sufficient for a reasonable jury to find that he is entitled to a verdict by a preponderance of the evidence. *Id.* at 252, 106 S.Ct. at 2512.

The non-movant may not "rest upon mere allegations, general denials, or ... vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.), *cert. denied*, 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991); *see* Fed.R.Civ.P. 56(e). The "unsupported statements of counsel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are unsupported allegations in the pleadings." *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990). The summary judgment procedure enables a party "who believes there is no genuine issue as

to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990).

██ This case presents the situation of multiple parties all cross-moving for summary judgment against each other. It bears noting, therefore, that just because both sides claim that there is no genuine issue of material fact in a case, it does not mean that either is entitled to a summary judgment ruling. As the Third Circuit has explained:

> [T]he making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968). Thus, cross-motions for summary judgment do not necessarily require a "sudden death" scenario. Despite the fact intensive nature of a Rule 56 motion, the ultimate determination is one of law, and the Court may find that neither party is correct in their belief that there is no genuine issue. Similarly, rejection of a party's application for summary judgment cannot be read as a preview of the Court's disposition towards the merits of that party's case, or a prediction of how it will fare at trial. All a denial of summary judgment signifies is that, at that moment in the procedural history of the case, the record did not preclude a reasonable jury from finding for the opposition. Certainly as the case unfolds, the fortunes of either party may change.

### 2. The Travelers CGL Policies

#### A. Voluntary Assumption of an Obligation

██ Travelers argues that Pittston's loss under the CGL policies is not covered, because Pittston was not "obligated to pay" Ultramar for clean up costs. Travelers contends that there was no bona fide basis for Ultramar to assert liability against Pittston, that Pittston's settlement with Ultramar was a sham, and that Pittston is not entitled to reimbursement for money paid to Ultramar

because the payment would be a voluntary payment not covered by the CGL policy. Furthermore, Travelers claims that it did not have a meaningful opportunity to object to the settlement. Thus, Travelers claims, its right to contest the liability of its insured was taken away.

This issue might be better categorized as a defense to coverage. However, in terms of the chronology of events, it is a threshold issue that is independent of the other, pollution-specific, insurance law doctrines in the case. Moreover, it is intertwined with another key issue in the case: whether the settlement between Pittston and Ultramar was reasonable. Thus, if the settlement was reasonable, the insured was not prejudiced by the alleged "voluntary assumption," and the issue becomes moot. Therefore, both will be discussed before reaching the more basic issues of coverage.

The Court finds the insurer's arguments on both these issues unconvincing. First, under the stock purchase agreement, it appears that Pittston simply retained whatever liability it would have had absent a sale of the site. Second, Travelers has not shown that the settlement was unreasonable. Finally, and conclusively, Travelers waived this argument in its letter of April 12, 1990, in which it informed Pittston that it would not object to the settlement on the voluntary payment grounds, reserved other defenses to payment, and instructed Pittston to conduct itself as a prudent insured.

As outlined generally above, when Pittston found itself faced with the prospect of an expensive upgrade of a redundant facility that no longer served their needs, the company decided to rid itself of Tankport. Apparently, the buyer that they found, Ultramar, was unwilling to assume the risk of liability for past pollution at the site, and this unwillingness was reflected in the stock purchase agreement.

At section 11(a) the agreement reads:

> The Seller agrees to indemnify and hold harmless the Buyer ... against and in respect of all of the following matters, ... (iv) any and all Liabilities arising out of or relating to any event occurring prior to April 30, 1983 at any terminal or other

property . . . which involved the discharge, emission, seepage, flow, or release of any petroleum product, by-product or any other agent or substance into the environment . . . with respect to any single Environmental Matter as to which the Liability exceed $1,000,000 in value for a period ending on April 30, 1995, . . . [and] with respect to any single Environmental Matter as to which the Liability exceeds $5,000,000 in value for an unlimited period. B1477–78. Schedule 4.4 to the agreement lists among "Undisclosed or Unrecorded Material Liabilities,": "Liability for environmental damage, if any, in connection with the Company's oil terminal at Tankport, Jersey City, New Jersey." B1530.

■ Travelers argues that the foregoing clauses are trumped by section 9.11. Subsection (a) provides that Pittston will pay one-half of the cost of upgrading the facility, up to $200,000, to bring into legal compliance any defect that existed before the closing date. Subsection (a) is made inapplicable to the present situation by subsection (b). This latter section says that if Ultramar notifies Pittston that "it intends to abandon Tankport as a result of its inability or unwillingness to comply with any Authorization or Law with respect to which Tankport is not in compliance on [the closing date]," then Pittston would make a payment to Ultramar based on the difference between the closing price and the net price Ultramar received when it disposed of the site. B1471–72. Again the payment was capped at $200,000. B1472.

Ultramar did decide to abandon Tankport rather than make the substantial expenditures necessary to bring the site into compliance with the NJDEPE requirements. Mannion Dep. at A2390. This triggered ECRA which requires that the owner of an industrial site who decides to cease operations must file and implement a plan of environmental remediation with the NJDEPE. N.J.S.A. 13:1K–9. The Court declines to find that a clean up pursuant to a plan to retire the site from industrial use is an "upgrade" within the plain meaning of section 9.11(a). Moreover, the language of the agreement shows that the notification of Pittston by Ultramar that it would abandon the site triggered subsection (b), not subsection (a). Ac-

cordingly, subsection (a) is irrelevant to Pittston's liability to Ultramar.

As to subsection (b), it is clear that its purpose was to compensate Ultramar for any loss in value of the site due to unknown, pre-existing conditions. This subsection does not address liability to third parties, including governmental entities. There is no apparent reason to conclude that the indemnity provision of section 11 was not intended to be supplemental to rather than exclusive of the liability of Pittston to Ultramar under section 9.11(b).

If sections 9.11 and 11 were truly in conflict, it is facially arguable that 9.11 should control under the maxim of contract interpretation that the specific should control the general. See Restatement (Second) of Contracts § 203(c). However, interpreting the language in this way would make section 11 surplusage. The $200,000 cap of section 9.11 would apply before the $1,000,000 floor of section 11 was reached. Such an interpretation would run afoul of a more basic principle of interpretation that, where possible, a court should read provisions of a contract so that each has meaning. *J.E. Faltin Motor Transp. v. Eazor Express,* 273 F.2d 444, 445 (3d Cir.1959).

This principle is founded on the proposition that the duty of the Court is to determine the intent of the parties in forming their agreement. It would be most unreasonable to assume that Ultramar would have negated so substantial a right as indemnification for clean-up costs of Tankport with a $200,000 cap. *Id.* ("It would not be good interpretation to disregard language of the parties as meaningless or absurd if that can be avoided."). It is far more likely, and equally consistent with the language of the agreement, that section 9.11 was intended as a limited remedy for the loss of value to Ultramar of the property if they were to decide that it must be abandoned, whereas section 11 deals with liability to third parties and governmental entities.

This appears to be the commercially reasonable reading of the transaction between Pittston and Ultramar as well. Pittston transferred away title to the facility, but could not rid itself of its potential liability.

Pittston undoubtedly acted in reliance on its belief that it was insured for such liability, and simply retained that undesirable incident of former ownership. The Court must assume that the sale price it received reflected this fact. Consequently, the insurers' argument that Pittston's settlement with Ultramar was an "assumed" obligation is meritless. In terms of its practical effect, it is better characterized as a retained obligation.

 Secondly, there has been no showing that the settlement was unreasonable, or that Travelers could have done better. Pittston's liability for substantial sums for remediation appears plain in the terms of its agreement with Ultramar. Generally, where an insured settles a claim against it without the permission of the insurer, the insurer must, nonetheless, demonstrate prejudice before being relieved of its policy obligations. Mitchell L. Lathrop, *Insurance Coverage for Environmental Claims*, § 2.02[2] at 8–21 (1995); Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes*, § 5.06[a] at 177 (6th ed. 1993). It is true that many of the cases that subscribe to this proposition arise in the context of an insurer's refusal to defend. *See, e.g., Bunge Corp. v. London & Overseas Ins. Co.*, 394 F.2d 496, 497–98 (2d Cir.), *cert. denied*, 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968). However, as the New Jersey Supreme Court discussed in *Griggs v. Bertram*, 88 N.J. 347, 366, 443 A.2d 163 (1982), this area of insurance law is concerned with fairness. *See id.* at 367–68, 443 A.2d 163 (where insurer wrongfully refused to announce coverage position, it has burden to show settlement unreasonable or reached in bad faith). Where there is no genuine question that the settlement reached by the insured is what the insured legitimately owes, it is equitable to require the insurer to respond.

Here, the Court is satisfied that the language of the stock purchase agreement quoted above establishes Pittston's liability to Ultramar beyond any reasonable dispute. Therefore, the Court finds that the settlement was reasonable and Travelers' interests were not prejudiced by it. Consequently, the insurer may not assert the voluntarily assumed obligation condition to avoid liability to its insured.

Despite the insurer's vigorous attack on this aspect of Pittston's case, none of its arguments are persuasive. Travelers's numerous arguments all founder on one important truth. The Court is satisfied that the 80%/20% split of cleanup costs that Pittston agreed with Ultramar was an excellent result in light of the comparatively insignificant amount of time Ultramar had spent in possession of the site, the fact that many of the Pittston years of ownership occurred when the industry was less environmentally aware, and that, as discussed above, the stock purchase agreement clearly obligated Pittston to pay for 100% of the pre–1983 contamination. Thus, Travelers accusations of a collusive settlement, or that it represented a compromise of other, non-covered claims against Pittston, are unpersuasive.

The Court will not burden this lengthy opinion with a point by point refutation of Travelers' arguments on this score, with one exception. Travelers points to an amendment of the stock purchase agreement section 11(a)(iv) claiming that it gave Pittston a clear defense to any claim Ultramar might assert. The Court finds that the fact of the amendment had no effect on the reasonableness of the settlement.

The amendment added the qualification that the discharge creating liability had to have come from a vessel, tank, pipeline, etc., that was owned by Pittston during the discharging event. Because the insured has owned Tankport since 1954, including all of the left over Eagle Works facilities, this limitation would only exclude indemnification for pollution that escaped prior to 1954, and that remains on the site to this day. Given the length of time, and the documented groundwater flow across the site, *see* B2331, it would have been reasonable for Pittston's attorney's to conclude that the pollution excluded thereby would represent an economically insignificant portion of the clean up costs, particularly because a massive clean up effort must be undertaken for post–1954 contamination in any event.

In any case, indemnification for pre–1954 contamination was included by another part of the amended section 11(a)(iv). A clause was added that provided that any pollution

liability not otherwise included would be indemnified by Pittston as long as Pittston would be covered by insurance for such damage. Pittston maintains to this day that the Eagle Works contamination is covered by its CGL policies, and the Court finds below that its claim in this regard will survive a motion for summary judgment. Therefore, assessing Pittston's pre-settlement state of mind, if the pre–1954 damage is covered, the amendment would not reduce the insured's enforceable indemnification obligation to Ultramar, and the reasonableness of the settlement. Of course, if it turns out that the pre–1954 damage is not covered, the reasonableness of the settlement agreement is moot.

■ Travelers has submitted the affidavit of Curtis Meanor, formerly a judge in this district. It is in the form of an expert's certification, and purports to find. that there was no legal basis for Ultramar's claim against Pittston for petroleum contamination. No cases are cited; its conclusions rest on statements of the law whose authority appears to be Judge Meanor's own learning.

It is no reflection on Judge Meanor's jurisprudence to note that this document has no more force than any other attorney's legal argument. Indeed, the Court finds that this submission is most properly characterized as an additional brief in opposition to Pittston's motion for summary judgment. Travelers argues that this is an expert's affidavit. However, the Court finds unpersuasive Traveler's premise, that the underlying liability of Pittston to Ultramar is an independent question of fact and thus a proper subject for an expert's affidavit. On the contrary the Court believes that the submission is a legal memorandum submitted in violation of the rules of this Court.

Pittston moves the Court to strike the Meanor certification. This motion will be granted. The Court, with humility, reminds the parties that the only authoritative expert on the law of this case is the Court itself. Moreover, on review of Judge Meanor's brief, the Court finds that the argument presented with regard to the interpretation of the stock purchase agreement has been dispensed with above.

■ Finally, the Court finds that Travelers waived the assumed liability condition.

In response to a letter of April 3, 1990, Travelers' Assistant Account Manager Christopher Strapp wrote to Arthur Wheatley, Pittston's Vice President and Director of Risk Management on April 12, 1990. Strapp stated that "If Pittston should reach a settlement with Ultramar as outlined in the Settlement Agreement, The Travelers will not consider such action a violation of the policy conditions prohibiting voluntary payment or assumption of obligations." B2449. The letter goes on to reserve other defenses including the right to contest the reasonableness of the settlement. *Id.* The letter provides that "If the Settlement Agreement has already been executed, please forward a copy of the final terms and conditions." *Id.*

Travelers now contends that this waiver is ineffective because it was obtained by a misrepresentation. Travelers cites a March 27 letter from Pittston's attorney Timothy Vanderver to Diane Naylor of Johnson & Higgins, Pittston's insurance broker, that was then appended to the April 3 letter to Travelers. Strapp Decla., Exhibit J. In this letter Vanderver states that "Since motions in the litigation between Ultramar and Pittston and others are scheduled for hearing on Monday, April 9, 1990, we must have any responses no later than close of business on Wednesday, April 4, 1990."

Travelers claims that plaintiff has now admitted that there was no time pressure, but that the statement that an answer was needed quickly was a misrepresentation intended to induce Travelers improvidently to agree to the settlement. Assuming that there is such an admission in the record, and Travelers provides no citation for it, the Court finds that this argument is without merit.

First, there is no showing that by stating that there was a time pressure, Pittston intended to induce Travelers to agree to the settlement improvidently. Second, the Court does not believe that such a representation as to a time pressure would be material to Travelers' decision to waive the voluntary payment condition. If it were, surely Travelers was free to withhold its waiver on the grounds that it was not given enough time. Moreover, as quoted above, the waiver letter itself provides for the fact that the settle-

ment might already have been signed before the waiver letter was received by the insured, which in any event was dated *after* the supposed April 9 date of the motions. Thus, it appears that, whatever it may claim now, then Travelers felt no particular time pressure. Finally, it is not even established that the contents of the Vanderver letter constitute representations to Travelers. They were originally sent from the Pittston attorney to Ms. Naylor, and only then transmitted, for whatever reason, to Travelers.

For all of these reasons, the Court finds that there is no genuine issue whether Travelers' waived the voluntary payment condition on the policies and that the settlement was reasonable. Therefore, and for the other reasons discussed above, the Court will grant summary judgment to plaintiff that coverage for liability to Ultramar under the Settlement Agreement between Ultramar and Pittston settlement is not barred by the voluntary payment or assumption of obligations conditions on the policies.

### B. Damages

Pittston argues that sums it is obligated to pay to a third party as a result of environmental damage are "damages" under the law construing CGL policies. *Citing Morton Int'l, Inc. v. General Accident Ins. Co.,* 134 N.J. 1, 25, 629 A.2d 831 (1993), *cert. denied,* — U.S. —, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994); *Hatco Corp. v. W.R. Grace & Co.,* 801 F.Supp. 1334, 1364 (D.N.J. 1992). This is settled law, and not disputed by Travelers. It will be important to the discussion that follows to pinpoint exactly what type of physical damage is at issue here.

There is no dispute that the soil at Tankport is severely contaminated with oil. Significantly, groundwater contamination is also a key issue in this case. Its prominence is due not only to the expense of remediating ground water contamination, but remains an issue of importance due to the "owned property" exclusion in the CGL policies. First Pittston argues that the groundwater is the property of the state, and thus not "owned property." Second, Pittston contends that

there is evidence that the contaminated groundwater is migrating off site. As will be discussed more fully below, the law teaches that where there is some evidence of migration off site, measures necessary to stop that migration, including cleaning up "owned property," are also covered. The issue of groundwater contamination is also dominant because Pittston argues that it was unaware of groundwater contamination for purposes of the "expected nor intended" clause in the policies.

Other off-site property damage may include contamination associated with the oil/water separator. Further there is damage to the banks of Caven Creek that, as far as may be determined from the record at present, may be completely off the site.

### C. The Continuous Trigger

■ Pittston maintains that the continuous trigger theory should be applied here. Of course this theory is the law of this state. *Owens–Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 455–56, 650 A.2d 974 (1994); *Hatco,* 801 F.Supp. at 1346.[4] It holds that an occurrence triggering coverage under a CGL policy continues over a span of time, beginning from the first exposure to injurious conditions, continuing through any period of latency or while the resulting damage remains undiscovered, and ending at the time the injury manifests itself to the insured.

■ Pittston maintains that the contamination of the site is the product of an indivisible process of "property damage" that was in progress in 1954 when it took over the site, and continued until the day it sold the site to Ultramar. This property damage included that caused by the abandoned and leaking Eagle Works equipment hidden around the site. Pittston also argues that the occasional spills and leaks incidental to their own operations contributed to the continuous damage. Despite their maintenance and clean-up efforts, which Pittston maintains were adequate for the time and the circumstances, some oil seeped into the ground and thence into the groundwater.

---

4. The New Jersey Supreme Court's modification in *Owens–Illinois* of the continuous trigger theory for purposes of allocating responsibility between policy periods does not affect the resolution of the issues now before this Court.

The Court determines that these events require the application of the continuous trigger theory to the facts of this case. As to the escapes of oil during Pittston's tenure at Tankport, no party has authoritatively linked the general groundwater contamination or the leakage into New York Harbor to any particular spill or other incident. Instead, the allegations are that an ongoing pattern of poor housekeeping has had the cumulative effect of causing the damage at issue.

■ Any Eagle Works contamination is also within the scope of the continuous trigger theory. Obviously the date of the first exposure to injurious conditions attributable to Eagle Works is outside the policy period. However, the record establishes that oil from Eagle Works has been slowly seeping into the groundwater, Caven Creek, and the harbor from the abandoned pipelines, junction boxes, etc. Therefore, the damage was ongoing, and continued to trigger each successive policy. The Court is aware of no condition in the policy that the damage must be a result of the insured's activities, so long as the insured is truly liable for that damage. Thus, to the extent that the Eagle Works pollution was neither expected or intended by Pittston, as will be discussed below, the environmental damage that occurred during the policy period caused by discharges that occurred during the Eagle Works era triggers the policies.

In response, Travelers makes the following arguments. First they contend that the damage at Tankport is divisible. For example, they say that certain tanks were taken out of service at different times during Pittston's ownership. Travelers believes that policies issued after the date a tank was retired should not be triggered for clean up costs associated with that particular tank. Travelers points out that the contamination of the site is not uniform, but that there are "hot spots" and areas of less contamination.

The record does not show that the overall groundwater contamination may be traced to any particular tank. Nor does it appear that the Eagle Works contamination may be limited to any particular policy period. The oil/water separator serves a number of tanks, and there has been no showing as to which, if any, of these tanks were taken from service during the relevant times. As the Court reads the submissions of the parties, these three areas of environmental damage constitute the majority of the harm for which coverage is sought, and they appear clearly within the compass of the continuous trigger theory.

If the amount of damage traceable to various areas within Tankport may be apportioned at some later date, it is conceivable that the insurers may reduce some part of the liability otherwise assessed. Pre-trial summary judgment is not the stage in the proceedings at which such an apportionment should be undertaken. It suffices now to observe that there is no genuine issue of fact that a significant proportion of the environmental damage in this case is amenable to the continuous trigger theory, and the case will proceed on that basis.

■ Second, Travelers attempts to distinguish its policies in effect after 1972 from the policy in *Hatco*, 801 F.Supp. at 1334, where this Court applied a continuous trigger. Pre–1973 policies defined occurrence as "an accident, including injurious exposure to conditions, which results, during the policy period, in ... property damage...." Strapp Decla. ¶ 8. This is similar to the *Hatco* language. *See* 801 F.Supp. at 1344. After 1972, the "during the policy period" time limitation was moved from the occurrence definition to the property damage definition. This provision now defined property damage as "physical injury to or destruction of tangible property which occurs during the policy period." Strapp Decla. ¶ 9. Travelers argues that this change of language means that the continuous trigger theory does not apply to the post–1972 policies.

The Court disagrees that these policies are outside of the broad run of CGL policies that have been held subject to the continuous trigger. First, although the re-wording of the policy does effect a subtle shift in meaning between the pre- and post–1972 policies, it does not change the meaning sufficiently to render the continuous trigger theory inapplicable. The change is that, where previously it was the exposure to conditions that was to have taken place during the policy periods, subsequently it was the property damage

that must have occurred during the relevant period.

Unfortunately for the insurers, the heart of the continuous trigger theory is that damage is ongoing. When the damage becomes apparent does not dictate when it occurs. In the asbestos cases it was recognized that "some injury to body tissues occurs on the inhalation of asbestos fibers" even though no diagnosable illness may result for many years. *Owens–Illinois*, 138 N.J. at 454, 650 A.2d 974. In property cases, "the injury to property caused by asbestos is both continuous and progressive." *Lac D'Amiante Du Quebec, Ltee. v. American Home Assurance Co.*, 613 F.Supp. 1549, 1561 (D.C.N.J.1985). As with the release of asbestos fibers by a process of "slow continuous degradation," *id.*, so too the gradual seeping of oil from abandoned Eagle Works pipes, the accumulation in the groundwater of oil from uncounted routine mishaps, the percolation of oil-laden rainwater through the overburden, all constitute ongoing and progressive physical injury to property that "occurred" during the policy period. Therefore, moving the phrase "within the policy period" from one part of the policy to another has only semantic significance with regard to the application of the continuous trigger theory.

 Finally, Travelers argues that, even if the continuous trigger applies, the law provides that the trigger is cut off upon the manifestation of the injury. Again, Travelers relies on language from *Hatco*, 801 F.Supp. at 1345 n. 3. The cited language refers to "general principles of insurance law" to hold that the date of manifestation of the injury is the cut-off date for triggering multiple policies.

Travelers's formulation of the manifestation cut-off is simply another way of stating that the cut-off is the same as the "expected nor intended" condition of coverage. *Township of Gloucester v. Maryland Casualty Co.*, 668 F.Supp. 394, 402–03 (D.N.J.1987), relied on in *Hatco* for the proposition just cited, supports this view. There the court found that there was no occurrence within the policy period because the insured had actual knowledge of the occurrence before the period began. Recognition that two concepts

with such different nomenclature and pedigrees as manifestation and "expected nor intended" are identical in practice is counter-intuitive. The Court notes, however, that other important concepts in pollution coverage jurisprudence also merge more or less seamlessly,[5] and there is no objective reason why these two should not function in parallel.

Pittston maintains that the manifestation date is either the date Ultramar discovered the extent of the contamination or the date that it served Pittston with its amended complaint. Pittston cites *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 765 F.Supp. 881, 885 (D.W.Va.1991) *aff'd*, 957 F.2d 1153 (4th Cir.), *cert. denied*, 506 U.S. 824, 113 S.Ct. 78, 121 L.Ed.2d 42 (1992). There it was held that the injury was manifested when the insured received a letter from the EPA stating that, pursuant to CERCLA, the insured was a "potentially responsible party" ("PRP"). This case is distinguishable in that it dealt with a manufacturer's off-site disposal of toxic waste. Unlike the facts here, the opinion does not disclose whether Triangle Industries had any idea that there was environmental contamination before it received the PRP letter. It may be that Triangle's knowledge of the actual damage and its legal liability for it were acquired simultaneously. Consequently, that case will not support the proposition that only manifestation of legal consequences will cut off the trigger.

Pittston also cites *Gottlieb v. Newark Ins. Co.*, 238 N.J.Super. 531, 537, 570 A.2d 443 (App.Div.1990). There the court adopted the continuous trigger in a toxic tort case concerning the application of chemical pesticides in a home basement. The Appellate Division suggested that evidence of when "*all* of the damage from migrating pesticide was capable of being known or predicted" would mark the ending point of the occurrence. *Id.* On one hand, this case actually undermines Pittston's theory, because the court appears to have focused on the manifestation of physical contamination as opposed to the certainty of legal liability for it to determine when the injury was manifested. On the other hand, this may be explained by the fact that *Gottlieb* concerned first-party property coverage,

**5.** *See e.g.* Known Loss, discussed *infra*.

and not a third-party liability policy. By analogy, *Gottlieb* could be read to say that, where legal liability is the insured risk, the possibility of legal liability must rise to a given level of certainty for the injury to be manifested and the trigger cut off.

The New Jersey Supreme Court has reserved on the issue of when the injurious process ends. *Owens–Illinois*, 138 N.J. at 456, 650 A.2d 974. The Court takes guidance from the asbestos cases in which the continuous trigger theory arose. *Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982), is the progenitor. Lathrop, *supra* § 6.05[1] at 6–23. *Keene* found that loss in a manufacturer's CGL policy was manifested for purposes of the continuous trigger theory when it became known that the third party suffered from an asbestos-related disease. *Keene*, 667 F.2d at 1045. The *Keene* court focused on the point at which "an ordinary person would characterize a fully developed disease as an 'injury'" in contrasting manifestation from pre-manifestation injury. *Id.* at 1043. Also, in *Lac D'Amiante Du Quebec, Ltee. v. American Home Assurance Co.*, 613 F.Supp. 1549 (D.N.J.1985), Judge Barry focused on the manifestation of bodily injury caused by asbestos as a relevant consideration for the continuous trigger theory. *Id.* at 1558–59.

 These asbestos cases suggest that it is the date that the physical injury is manifested rather than the date when legal liability for the injury was fixed that constitutes "manifestation" under the law of CGL policies. On the other hand, where a lesser injury is manifested, it will not cut off the trigger for the purposes of some more egregious harm from the same source. For example, where an insured discovers that an asbestos victim has been diagnosed with asbestosis, that discovery will not cut off coverage if the victim later develops asbestos-related lung cancer. The reasonable expectation of the insured requires that "manifestation" has not fully occurred until the insured has knowledge, at least in general terms, of the extent of the damage or loss.

The New Jersey Supreme Court has stated that "Property-damage cases are analogous to the contraction of disease from exposure to toxic substances like asbestos." *Owens–Illinois*, 138 N.J. at 455, 650 A.2d 974. Thus, injury from the invisible seeping of contaminants into the groundwater may be analyzed in the same way as in the asbestos cases. The announcement by NJDEPE that the site would have to be cleaned up is analogous to a verdict in favor of an asbestos victim that the manufacturer is liable for his injury. It does not constitute manifestation of the injury, the diagnosis of the disease is the manifestation. Accordingly, the Court will define the manifestation of the injury as when the insured was aware, at least in general terms and to a reasonable degree of certainty, of the existence and the extent of the off-site and ground water contamination. This determination of this issue will turn on the same evidence as the "expected nor intended" issue discussed immediately below.

### D. "Expected nor Intended" as an Element of Coverage

The Travelers policies are "occurrence based," that is coverage is triggered by an occurrence as defined by the policy. Strapp 1st Decla. at ¶ 8. In general, all of these policies defined "occurrence" in the same way. *Id.* ¶ 6. Under the terms of the 1967–80 policies, an occurrence is "an accident, including continuous or repeated exposure to conditions, which results ... in bodily injury or property damage neither expected nor intended from the standpoint of the insured."[6] Strapp 1st Decla., Exhibit C.

 It is the insured's burden to prove a loss covered by the terms of the policy. *Diamond Shamrock Chem. Co. v. Aetna Casualty & Sur. Co.*, 258 N.J.Super. 167, 216, 609 A.2d 440 (App.Div.1992), *certif. denied*, 134 N.J. 481, 634 A.2d 528 (1993). Because the existence of an occurrence is an element of coverage, it is the insured's burden to demonstrate the loss was within the definition of an occurrence, "including the

---

**6.** Policies before 1967 defined an occurrence as, *inter alia*, an "accident" but omit the "expected nor intended" language. As the following discussion will demonstrate, the Court need not reach the issue of whether the pre–1967 policies contain an implied "expected nor intended" clause.

expected/intended clause." *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Sur. Co.,* 817 F.Supp. 1136, 1143–44 (D.N.J. 1993); *see New Castle County v. Hartford Accident & Indemnity Co.,* 933 F.2d 1162 (3d Cir.1991) (Delaware law).

■ It is plain from the language of the occurrence definition that whether damage is expected or intended is a question of the subjective intent of the insured. New Jersey case law has applied the language thusly, and the law in this state is well settled on the issue. *SL Indus., Inc. v. American Motorists Ins. Co.,* 128 N.J. 188, 212, 607 A.2d 1266 (1992); *Voorhees v. Preferred Mut. Ins. Co.,* 128 N.J. 165, 184, 607 A.2d 1255 (1992).

The New Jersey Supreme Court has recognized the difficulty in applying a subjective intent standard to environmental insurance claims. *Morton Int'l, Inc. v. General Accident Ins. Co. of Am.,* 134 N.J. 1, 85–86, 629 A.2d 831 (1993). In other types of cases, intent may be presumed where conduct has been particularly reprehensible. *Id.* at 86, 629 A.2d 831. For example, in *Atlantic Employers v. Tots & Toddlers Pre–School Day Care Center, Inc.,* 239 N.J.Super. 276, 282–83, 571 A.2d 300 (App.Div.), *certif. denied,* 122 N.J. 147, 584 A.2d 218 (1990), the inherent injuriousness of an act of child abuse was sufficient to serve as the basis for an inference that the insured expected or intended the injury. In contrast, the *Morton* court found that environmental pollution does not always involve such reprehensible conduct that it would justify a presumption that injury was intended. 134 N.J. at 86, 629 A.2d 831.

On the other hand, the court realized that "[a]bsent 'smoking gun' testimony from a disgruntled employee, proof of subjective intent to cause environmental harm will rarely be available in coverage litigation." *Morton,* 134 N.J. at 85–86, 629 A.2d 831. Accordingly, the court held that "in environmental coverage litigation a case-by-case analysis is required in order to determine whether, in the context of all the available evidence, 'exceptional circumstances [exist] that objective-

ly establish the insured's intent to injure.'" *Id.* at 86, 629 A.2d 831 (quoting *Voorhees,* 128 N.J. at 185, 607 A.2d 1255).

Under *Morton,* the lower courts must consider such objective factors as:

the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.

*Id.* at 86–87, 629 A.2d 831.[7]

By way of example, in *Morton* the insured had been intentionally discharging effluent into a creek for over a twenty year period. *Id.* at 87, 629 A.2d 831. There was no genuine issue that the insured knew that the effluent contained high levels of mercury. *Id.* at 87, 629 A.2d 831. Accordingly, the Court found that the environmental damage was anticipated by the insured from their knowledge of the effluent discharge, and that, therefore, there was no occurrence under the policy. *Id.* at 95, 629 A.2d 831.

■ *Morton*'s finding of subjective intent from egregious circumstances does not, however, mean that expected or intended damages are those that the insured *should have* expected or intended from the manner in which it conducts its business. This would be akin to a negligence standard. If negligent acts were not within the definition of a covered occurrence, then there would be no point in purchasing a policy of insurance against general liability. *J.T. Baker, Inc. v. Aetna Casualty & Sur. Co.,* 135 F.R.D. 86, 92 (D.N.J.1989). In *Morton,* however, the lower court "would have ignored reality to conclude that [the insured] did not know that the mercury and its effluent was harmful to the land over which it coursed and the waters into which it fell." 134 N.J. at 95, 629 A.2d

7. This Court notes that this last factor is not objective evidence at all, but is in fact the same "smoking gun" direct evidence of subjective intent that will be so hard to come by in most cases. The Court believes that this fact underscores the truth that while applying the law on the "expected nor intended" clause, the distinction between objective and subjective evidence need not unduly clutter the analysis. The two are only different means to a single end.

831. It is the insured's actual expectation that controls the occurrence clause.

■ Travelers relies on *Morton* for the proposition that where the insured expects or intends any amount of harm, the insured need not expect or intend the severity of harm for coverage to be barred. This is a mis-reading of *Morton*. *Morton* was concerned with whether there the objective circumstances surrounding the insured's conduct would allow the Court to find that the damage was expected or intended, without direct evidence on the insured's subjective state of mind. 134 N.J. at 86, 629 A.2d 831. The Court found that the insured's failure to appreciate the severity of the harm did not, in the circumstances of that case, make the harm so improbable that direct evidence was required to determine the insured's subjective intent. *Id.* at 90–91, 629 A.2d 831.

■ This does not mean that some appreciation of the amount of damage done will be irrelevant in other cases. As *Morton* makes clear, the expected or intended analysis is *sui generis*. *Id.* at 94, 629 A.2d 831. As in *Morton*, conduct may be so egregious that the claim that the insured failed to appreciate the magnitude of the environmental harm may not overcome the objective indicia that the insured had expected or intended the environmental harm to occur. *Id.* at 90–91, 629 A.2d 831. In such a case, no subjective evidence of the insured's knowledge of the extent of the damages would be required. *Id.* It follows from the inverse of this proposition that, where the objective facts are less incriminating, knowledge of the extent of damage will still be relevant. This Court holds that an important question while implementing *Morton*'s " 'exceptional circumstances' scheme" is whether the insured expected or intended damage that was "qualitatively comparable" to the damage that triggered regulatory liability. *Nestle Foods Corp. v. Aetna Casualty & Surety Co.*, 842 F.Supp. 125, 129 (D.N.J.1993).

Finally, it is important to note that the focus is not on whether the injurious act was intentional, but whether the insured expected or intended the resulting harm. *SL Indus.*, 128 N.J. at 207, 607 A.2d 1266; *New Castle County v. Hartford Accident & Indemnity*, 970 F.2d 1267, 1269 (3d Cir.1992) ("occur-rence clause provides coverage when the damage was unexpected and unintended, though caused by an intentional act"); *Hatco*, 801 F.Supp. at 1351.

■ Turning to the facts of this case, it is important to note at the outset that this is not a situation, like so many environmental insurance cases, where the insured is liable for clean up costs for the improper disposal of waste materials. *Compare Morton*, 134 N.J. 1, 629 A.2d 831; *Hatco*, 801 F.Supp. 1334. Here, the contaminant is a portion of the finished product that Pittston was in the business of selling. The fact that losing an appreciable amount of that product into the environment would have been an economic loss as well as an environmental problem changes the evidentiary equation of the case. Unlike the intentional dumping of mercury-laden effluent in *Morton*, here there was no motive to spill oil, and no genuine question that Pittston did not actually intend to allow oil to leak into the groundwater.

■ Of course, although the damage might not be intended, it might still be expected as provided under the occurrence definition. Furthermore, the foregoing finding that Pittston did not intend to pollute should not be read to hold that the presumption to be drawn from objective evidence set forth in *Morton* cannot be applicable here. Objective evidence may establish that an insured expected contaminants to escape and cause environmental damage just as it may establish that the insured actively and intentionally discharged a dangerous substance. Such a finding would be one of fact, but appropriately made on summary judgment where the record will support it. Finally, the insurer who is unable to take advantage of the presumption raised by objective evidence may be able to prove that the damage was expected by the insured through the use of direct evidence of the insured's actual knowledge during the policy period.

Both sides of this controversy have submitted voluminous factual material to show that the pollution was or was not expected or intended. Organized analysis of the expected or intended question presents a special challenge in the context of this case. The allegations concern, in part, ongoing house-

keeping standards rather than discrete events, and many of the events took place several decades ago. However, the areas of dispute over Pittston's stewardship of the site may be grouped into a few main categories. These are, 1) the equipment in use by Pittston at the site, specifically the tanks and the pipelines and normal operating procedures, 2) the abandoned Eagle Works pipelines and equipment that continued to leak oil, 3) whether Pittston was in knowing violation of environmental laws, 4) spills of oil, including steps taken in prevention and remediation, 5) procedures in place to collect, clean and discharge runoff water that collected at the site, and finally, 6) contemporary observations of environmental damage by government agents, environmental consultants and lay people that were communicated to responsible officials at Pittston.

The Court turns first to the evidence concerning Pittston's equipment and everyday operating procedures. Much of the factual submissions suggest that Pittston was taking routine, although perhaps not heroic, measures to avoid the discharge of petroleum. The level of oil in the tanks was frequently measured by hand to detect any loss. Foster Dep. at A1170; Coleman Dep. at A476–79. Active tanks, those that were regularly receiving or dispensing product, were gauged daily. Coleman Dep. at A476. Storage tanks were gauged weekly. *Id.* Where a discrepancy was found, the volume of oil in the tank was first adjusted to allow for changes due to fluctuations in the ambient air temperature. *Id.* at A478. If the difference could not be explained by expansion or contraction, a mistake in gauging or an unrecorded inventory transaction, the tanks and related pipelines were checked for leaks "to the extent they could be checked." *Id.* at 479. A layer of water was kept at the bottom of each tank, so that if it leaked only water would escape. Shivey Dep. at A2654–56.

Travelers has argued that the tank gauging method was deficient. It claims that there is testimony in the record that the gauging system was unable to detect a loss of 900 gallons per day. Stendardi Dep. at A2755–57. The Court finds that this testimo-

ny does not squarely support the factual proposition Travelers claims for it.

There is evidence that Pittston checked the condition of the insides of the tanks with varying degrees of regularity. In the earlier years, the insides of the tanks were cleaned and inspected whenever Pittston decided to change the type of product that they stored. Coleman Dep. at A468. At a certain point the tanks began to be inspected regularly. Coleman Dep. at A468. Tanks with faulty bottoms were taken out of service. Coleman Dep. at A474, A568.

David Coleman, Tankport manager from 1966 to 1983, described the inspection process as:

> Evacuation of the liquids, cleaning them to a gas free condition, physically going in on your hands and knees and with a ballpeen hammer and a chisel, inspecting the floor, both for visual pitting as well as seeing if you could develop any pits in the floor with a ballpeen hammer and a chisel.

Coleman Dep. at A665–66.

Above ground pipelines were checked daily for leaks. Coleman Dep. at A484. "[F]rom time to time" the underground pipelines were pressure tested. Coleman Dep. at A490.

Much has been made of the dikes surrounding the tanks. These dikes were originally intended to capture the product in the case of rupture of one of the tanks. These dikes were made of the material at hand. Each was large enough to contain the entire contents of the largest tank within its boundaries. Coleman Dep. at 462–64.

 Travelers maintains that a well-run tank farm would have had dikes and "tank basins," the area between the tank and the dike, that were lined with an impermeable material to prevent oil that escaped from the tanks from seeping into the ground. It is undisputed that the dikes and floors of the tank basins were permeable to water and oil. Pittston argued to regulators that the upward pressure of water would cause the liners to shear if they were placed under the tanks.[8] *See* B2286–90 (report of environmen-

---

**8.** Pittston also argues that there was no legal requirement that they have impermeable liners.

This issue will be addressed further in connection with regulatory compliance.

tal consultant to Pittston). Whatever the merits of this claim, the Court notes that, by itself, the permeability of the tank basins does not necessarily mean that it was expected or intended that oil was being spilled there and thence percolating to the groundwater.

Travelers also maintains that the dikes and tank basins were constituted of a cinder material that became sulfuric acid in rainwater, and that this contributed to corrosion of the tank bottoms. Travelers 12G Statement ¶ 20. The Court has not discovered corroboration in the record of either the presence of sulfuric acid in the tank basins, or that acid contributed to corrosion of the tanks. Travelers' citation of the testimony of Davies provides no support for this factual proposition. *See* Davies Dep. at A1045–48.

Travelers offers the admission of a senior Pittston official, Kaulakis, that if "dikes are pervious, hell, that stuff seeps through and there's no point of having dikes." Kaulakis Dep. at A1813. This remark was made in the context of a hypothetical discussion of a catastrophic tank failure, an event that never took place at Tankport. It does not in itself imply that Pittston was aware that oil was seeping into the groundwater from their tank basins. Finally, Kaulakis' statement was made in the context of explaining why he pushed for upgrading the tank basins in the late 1970's and early eighties. It does not show that the tank basins were below industry standards earlier in the pertinent policy periods.

The tank basins as well as the rest of the land at the site collected rainwater. The methods of dealing with these accumulations are the subject of controversy. Many of the tank basins were drained to an oil/water separator. It is not disputed, however, that a number of the tank basins were not connected to the separator. Coleman testifies that oil accumulations in these tank basins were skimmed off using vacuum trucks and absorbent pads.[9] Coleman Dep. at A584–87, A637–38, A744–45.

Defense counsel at oral argument stressed testimony to the effect that the skimming of tank basins was not undertaken until the late

1970's or early 1980's. *E.g.*, Coleman Dep. at A745. He maintained that statements that certain remedial or preventative measures were taken at a particular date imply that they were not taken before that date. First, the Court notes that counsel's syllogism is flawed. Stating that one does something at one time does not establish that the thing was not done at an earlier time as well. Second, the record shows that there was confusion on the part of witnesses. Thus, when Coleman was asked when they began skimming contaminated tank basins, he responded "in the late '70's, early '80's, when we devoted a truck for that purpose." Coleman Dep. at A745. Earlier, however, he testified that:

> Prior to [devoting a truck to the purpose], they would have picked up oil if there was substantial accumulation in the form of free floating product, either with absorbent pads, depending on the quantity, or by borrowing a truck or in some cases perhaps using a vacuum truck.

Coleman Dep. at A585; *see also id.* at A586–87.

Thus, there is testimony that shows that routine clean-up procedures were in place before the late 1970's or early eighties. Coleman Dep. at A585. On the other hand, water that was in a non-draining tank basin was allowed to percolate into the ground. *Coleman Dep. at A578; A637.* The testimony refers to water, not oil and water. Nonetheless, in 1995, we can well surmise that the water contained harmful amounts of oil that was not obvious or floating on the surface. Yet, there is no evidence that this was the understanding among Tankport officials during the policy periods, or that they expected or intended environmental damage by allowing rainwater to soak into the ground.

■ Travelers's cites as an admission the testimony of a Pittston engineer that standard industry procedure was to have the bottoms of tanks raised at least two feet above grade to prevent corrosion. Mootz Dep. at A2495. Here, most of the tanks sat directly on the ground. Coleman Dep. at A465–66. Travelers contends that placing

---

9. Absorbent pads used in the oil industry have the ability to absorb oil without absorbing any of

the water on which the oil is floating. Coleman Dep. at A588.

the tanks directly on the low lying ground "unavoidably" lead to corrosion and leaks of oil. Despite the intuitive appeal of this proposition, the authority cited does not support this fact nor the fact that Pittston was aware of any such inevitability.

Other of the evidence cited by Travelers is of little persuasive force. Travelers' citation of the testimony of Mannion for the proposition that the tanks were in use until they actually sprung leaks and poured oil into the ground is misleading. Travelers Brief for Summary Judgment at 4 (citing Mannion Dep. at A2402). Travelers maintains that Pittston intentionally discharged oil because it drained the oily water layer at the bottom of the tanks directly onto the ground. Pittston points out that the testimony shows that the draining of the water layer was done carefully to prevent an escape of oil. The outflow was monitored and shut off when oil was detected escaping with the water. Shivey Dep. at A2663–64; Coleman Dep. at A727. The water was drained slowly to avoid mixing oil with water. Stendardi Dep. at 151–52, A2812–13. At least after 1979, Pittston employees testify that the outflow did not go directly on the ground, but onto an absorbent pad to catch any oil. *Id.*

The oil/water separator has been a particular focus of the litigants. This structure consisted of three square pools. It worked solely by operation of gravity. Stendardi Dep. at A2782. The simplicity of its operation speaks of a more naive era with regard to environmental protection. The oil/water mixture was delivered by pipes from the tank basins to the first pool where the bulk of the water would sink to the bottom. The oil floated to the top, was skimmed off and returned to inventory. The remaining mixture would flow to the second pool through a pipe located below the surface. The second pool would have less oil, but this would also float to the surface and be removed. The process was repeated with a third pool. After the third pool, the remaining water, supposedly oil-free, was discharged into a ditch running to Caven Creek.

Surprisingly, the parties cannot even agree on the construction of this apparatus. Trav-

elers contends that the pools of the separator were not lined. Travelers 12G Statement ¶ 25; Suler Dep. at 2957. Pittston offers testimony that the separator was lined, at least on the sides, with cement. Coleman Dep. at A449–51; A454–55; Shivey Dep. at 2644. There is no direct evidence cited to the Court as to what the bottom was lined with, if anything.[10]

Pittston argues that there was no reason to line the bottom of the separator pools, because of the way the separator was designed, *i.e.,* all of the oil floated to the top. Pittston Reply Brief for Summary Judgment at 7 n. 12. Travelers provides evidence that this was not an effective design. A Pittston engineer has testified that a separator with an unlined bottom "simply wouldn't work," and that industry standards in place in 1971 or 1972 would have required a lined bottom. Mootz Dep. at 2531–32. This testimony is of doubtful value, because it is in the form of expert opinion, and it is not established that the witness was testifying in that capacity. Nor does it establish one way or other whether the Tankport separator's bottom was lined. However, it is beyond dispute that there was oil sludge that sunk to the bottom of the separator.

There is testimony that the oil was removed from the separator regularly. Shivey Dep. at A2639–40. Pittston maintains that the separator was monitored to detect any overflow. Stendardi Dep. at A2776–77. Stendardi testified that he observed the third pool often and that there was never any oil in it. Stendardi Dep. at A2776–77. Likewise there is testimony that the discharge from the separator was always oil free. Shivey Dep. at A2642; Foster Dep. at A1417–18.

Travelers, on the other hand, contends that the separator was a significant source of pollution. Travelers maintains that oil sludge in the separator sank to the bottom of the pools and, because there was no impermeable bottom to the separator pools, the oil soaked directly into the ground. Employees testify that they saw oil stains on the ground around the separator. Shivey Dep. at A2653. Longtime employees do not recall

---

10. Pittston claims that evidence of an impermeable clay layer at the bottom of the separator exists at page B2066. The Court does not find this evidence at this point in the record.

ever seeing the separator emptied or the sludge cleaned out of the bottom. Shivey Dep. at 2644; Foster Dep. at A1326–27. There is testimony that the separator would overflow on occasion due to rain or high tides, Clark Dep. at 388, although other testimony exists that this only occurred once. Foster Dep. at 1209–11. Travelers submits evidence that various persons observed a heavy coat of oil on the surface of the separator. B214.

Travelers also submits Kaulakis's remark that the water treatment system was "a disgrace." However, this must be taken in context as it precedes the statement that "this was the kind of thing that any modern oil handling facility would never put up with." Kaulakis Dep. at A1812. Drawing the inference in favor of Pittston, it is fair to note that Kaulakis stops short of saying that the treatment system, although obsolete, was actually polluting or that it would not have been sufficient in an earlier, more permissive era.

■■■■■ Evidence concerning regulatory compliance during Pittston's tenure is another important factor to be considered in analyzing the "expected nor intended" issue under *Morton.* At oral argument, counsel advanced the proposition that, because the Federal Clean Water Act, and the New Jersey Water Quality Improvement Act have prohibited discharge since 1971, that this requires a finding under *Morton's* compliance factor that Pittston knew of the environmental damage it was creating. Transcript of Oral Argument, July 19, 1995 at 25. Counsel relied on the Third Circuit's recent opinion in *Hatco Corp. v. W.R. Grace & Co.,* 59 F.3d 400 (3d Cir.1995), vacating and remanding this Court's decision reported at 801 F.Supp. 1309 (D.N.J.1992).

■■■■■ This reliance is not well placed. The importance of legal compliance under *Morton* is the guidance it may give the finder of fact as to the subjective intent of the polluter within specialized meaning of the "expected nor intended" clause of an insurance contract. In *Hatco,* the Court of Appeals addressed the scope of a contractual release that, by its terms, only extended to liabilities within the knowledge of certain officials of

the releasor. The Court of Appeals found that, although CERCLA was not yet in effect as of the contract date, CERCLA liability was "known" to these officials because they were 1) aware of the environmental problems at the site, and 2) there was liability under existing federal and state law before the closing date. 59 F.3d at 408–10. Subjective awareness of environmental damage, the key issue in this case, was a factual predicate of the appellate decision in *Hatco. See Id.* at 408. Moreover, the question there was awareness of liability, not the expectation or intention concerning environmental damage. The issues are not comparable, and, therefore, the Court of Appeals' holding in that case is not applicable here.

By advancing this argument, Travelers has overlooked the subjective element of the "expected nor intended" clause. Travelers argues in effect that the Court should find that the existence of the environmental statutes creates an inference of subjective intent. This is akin to charging the insured with constructive knowledge of both the statute and the violation of it, a notion derived from the concept of objective intent, *i.e.,* negligence. Such a result would be anathema to the principles of subjective intent embodied in the "expected nor intended" clause of an occurrence based insurance policy under New Jersey law.

■■■■ Instead, the correct application of this *Morton* factor is the extent to which documented instances of regulatory violations show that the insured actually expected or intended to cause environmental damage. Travelers points to evidence of three incidents where Pittston was fined for oil spills. In September 1976, a spill occurred, that, as far as the Court's search in the record has determined, was the largest single spill incident in the site's history. Two hundred ninety-one thousand gallons were spilled when a pipe coupling let go during the unloading of an oil barge. B236. Five thousand gallons escaped into Caven Creek and Pittston was fined $3,000. Fines were levied for two other, much smaller spills as well. The log of reported spill incidents at B236–37 shows fifteen other, relatively small spills from 1972 to 1985 that triggered no sanctions.[11]

---

11. Prior to 1972, the record shows that spill incidents were not systematically reported.

Coleman Dep. at A517–18; A819–20.

These incidents provide scant support for the insurer's position on the "expected nor intended" question. The minor penalties imposed by the authorities are on a scale that is completely disproportionate to the magnitude of the environmental problem that we now know to exist. Pittston officials testify that spills were cleaned up as a matter of regular policy. Shivey Dep. at A2676–77. Thus, the spills and the resulting fines do not rise to the level of an exceptional circumstance that would objectively establish Pittston's intent to cause environmental damage under the legal compliance prong of *Morton.*

■ At oral argument and in their briefs, counsel for the insurer urged the Court to examine the permit application history of Tankport. The general history of permit applications has been mentioned above. The Court will now turn to it in greater detail.

In 1974, Pittston filed a Spill Prevention Control and Countermeasure Plan ("SPCC") with the EPA. B617–41; Coleman Dep. at A679; Plaintiff's 12G Statement ¶ 243. This plan represented that Pittston expected Jersey City to acquire the site by condemnation in the next few years. Therefore, the plan states, it was developed "as a statement of existing conditions." The plan provides further that: "This manual ... explains those measures that have been instituted at this facility in the interest of water pollution abatement in general and specifically the prevention and control of oil 'spills.' It is realized that this plan may be deficient in part, however, due to the impending takeover of this property by Jersey City, the initiation of remedial measures is deemed imprudent." B619.

Counsel for Travelers has quoted this passage at length to the Court. He urges the Court to find that it is an admission of intended or expected environmental damage. Of course this quote falls well short of that. While the SPCC is certainly incriminating, the Court finds that a reasonable fact-finder could read the 1974 SPCC plan as a candid recognition that control mechanisms were sub-standard, and that Pittston was asking for leniency in light of the economic waste involved in a significant investment in a site soon to be condemned. Most importantly,

the SPCC does not disclose that Pittston was aware that the shortcomings at Tankport were contributing to actual, ongoing environmental damage.

In 1974, Pittston contested the conditions the EPA had placed on the grant of a National Pollutant Discharge Elimination System Permit ("NPDES") on the ground that the requirements were impractical. B709. Travelers claims that Pittston was less than candid in the NPDES permit application, because it excluded rainwater runoff. Actually, Pittston's cover letter called the regulator's attention to the lack of a space on the form to report runoff, and pointed out to them that the application omitted calculation of discharge due to runoff. B239. This lack of disclosure was not the regulatory violation Travelers claims. On the contrary, a reasonable interpretation of the application is that Pittston put the regulators on notice to inquire further concerning runoff. *See also* B241.

Various other SPCC plans were filed through the years. *See, e.g.,* B249. In 1977, the State of New Jersey assumed the oversight of SPCC plans. In 1978, the state required Pittston to file more plans, known as a Discharge Prevention Containment and Counter–Measure Plan and a Discharge Cleanup and Removal Plan ("DPCC/DCR"). B327 *et seq.* Still asserting that the site would be closed "within the next four years," Pittston stated that plans calling for impervious dikes, and other containment measures were included in the application as "a conceptual proposal." B343. It is clear that actual implementation was not contemplated as the projected start of construction specified in the plan was four years away.

Travelers argues that the evidence concerning Pittston's regulatory filings show conscious noncompliance with regulations, and, therefore, support an "expected nor intended" finding under this *Morton* factor. The Court believes that the filings add further detail to the picture of an old, obsolete and run-down oil terminal. However, they do not compel a finding of a pattern of willful or knowing violation of pollution regulations as the insurer would have the Court find. A

reasonable trier of fact could find that Pittston's disclosures in the plans and permit applications, while colored by self-interest and far from ideal from the standpoint of environmental health, nonetheless evidence a grudging recognition of its responsibilities in this area.

Travelers maintains that the fact that Pittston's claim that it was never subjected to substantial penalties for polluting is of no consequence. Travelers points out that a miscreant may break the law without being caught, and analogizes to a driver going sixty miles per hour in a school zone. Travelers Opposition Brief to Pittston's Summary Judgment Motion at 35 n. 41. The analogy shows the flaw in the argument. Environmental regulation of large scale industrial sites is a far cry from traffic regulation. Each site is different, whether the operator should be subjected to governmental directives or sanctions is a case by case determination. *See* N.J.A.C. 7:1E–4.6(e) (1978) ("[NJDEPE] recognizes that the designs of major facilities differ, and that therefore appropriate methods of discharge prevention are necessarily site-specific.") (adopted March 30, 1978, 10 N.J.Reg. 187(a)) (current version at N.J.A.C. 7:1E–1.11).

Businesses legitimately order their expectations based on what environmental regulators officially determine is the appropriate course of action. This Court would never hold that a polluter who evaded official action against it was, per se, acting legally. However, the lack of a specific order of remediation or the absence of a substantial legal penalty imposed with regard to Tankport, robs this factor of much of its force in the expected or intended analysis. *Compare Morton,* 134 N.J. at 87, 629 A.2d 831.

■ Travelers maintains that the failure to install impermeable liners in the tank basins was a specific violation of the rules, and shows that Pittston expected or intended environmental damage. As late as June 1984, NJDEPE favored the installation of impermeable liners, and disagreed with Pittston's analysis of their impracticality, but was willing to consider alternatives if the liners were too costly. B428. The applicable regulation, 40 C.F.R. § 112.7(c), lists impermeable liners as only one of a number of spill control alternatives. Thus, it cannot be

said that the dikes were so substandard as to violate the law, although they may not have been the optimum protection.

■ It is the final *Morton* factor, direct evidence of the insured's knowledge of the damage, that is most persuasive in this case. This consists of admissions of Pittston officials, internal reports by environmental consultants, and communications from outside experts and regulators concerning the status of Tankport.

In 1977, Foster, Vice-president of Operations at Tankport from 1961 to 1988, wrote to the president of Pittston. B643. The letter paints a bleak picture of the environmental situation. Foster wrote: "As we all know, for the past several years we've held Tankport together with bailing wire, chewing gum and a few prayers." B643. Foster recounted that maintenance had been minimal because the site had certain drawbacks from an operations standpoint. Foster advised his superior that Tankport was not in compliance with environmental regulations due to the permeability of the tank basin dikes, the lack of spill containment at the place where the delivery trucks were loaded, and because the oil/water separator and drainage system were not of an approved type. B644.

The report of Tankport's division for 1978 also appears in the record. B709. The report noted the trend toward more stringent environmental regulation, B709, and the newly enacted New Jersey Spill Compensation Act. The report noted that, although no E.P.A. action had been taken on the pending permit applications, "it is doubtful that we'd be able to meet even the most liberal effluent limitations." B724. A substantial investment was predicted to bring Tankport "into compliance." B724.

The June 1979, Environics study is particularly damning. Test wells showed oil contaminating the groundwater in excess of federal and state standards. B2324. The oil/water separator was deep in oil sludge. B2314. The tank basins contained oil floating on top of standing water. B2331.

Of particular importance for this case are the findings concerning groundwater. Environics determined that the groundwater level

was within inches of the level of standing pools of water in many of the tank basins. B2296. Some of the basins appeared to be permanently flooded. *Id.* "Accumulations of free-floating oil were observed within the flooded diked areas." B2308. The contaminated tank basins represented approximately 75% of Tankport's area. B2312. The oil had weathered to varying degrees, suggesting that some of it had been there for a long period of time. B2308. Dry tank basin floors showed oil permeated soils. B2310.

In addition to oil in tank basins, low lying areas of Tankport had "exposed[d] contaminated groundwater." B2313. At one point there was a six inch layer of fresh and weathered oil lying in the ground. At another there was a one-half inch of oil at the surface. B2314. Even more oil was found accumulated in the soil. B2314.

Wells were dug to test the groundwater and an analysis of the groundwater contamination was undertaken. Every sample showed contamination above the federal discharge limit. B2324. Two significant points emerge. First, the test wells "do not suggest clear-cut, classic 'oil-floating-on-clean-water' picture." B2324. Rather the groundwater presented dissolved and undissolved layers of oil. B2324. Second, Environics found a layer of a petroleum product foreign to Pittston's operation below one of the cleaner tank basins. B2325. From these facts it is reasonable to infer that at least some of the groundwater contamination had been present for many years, even from before Pittston acquired the site.

The Environics report had some good news. "The subsurface oil pollution was not as severe as preliminary observations suggested." B2332. "No major subsurface 'pools' of oil were discovered." B2325. On the other hand, the report states clearly that oil contamination was migrating off site.

> Substantial accumulations of oil contaminated creek and Bay bottom muds were observed, and groundwater flowing from the site was observed to carry floating oil into the Upper Bay. These conditions are violations of State and Federal regulations, and although responsibility for pollution of the benthic muds might be arguable, the present contamination of groundwater and

direction of the flow of groundwater are not.

B2331. In the area of the separator, substantial surface oil was reported, both fresh and weathered. B2314. The ditch and the creek to which it led were both heavily fouled. An oil slick and residual oil on the marsh grass was "obvious." B2316.

The record contains a report signed by Kaulakis titled "An Assessment of Metropolitan's New Jersey Terminal Facilities and Needs" dated October 1, 1979. This report also called for substantial investment to meet regulatory requirements. Kaulakis wrote:

> As regards compliance with applicable regulations, Tankport is clearly not complying with ... State and Federal regulations on handling surface water and on preventing contamination of ground water.... [A]s a result of recently introduced tighter State regulations and procedures, more emphasis on compliance is expected. In accordance with these, new plans ... were submitted to the State on September 1, 1979 for State approval. The essence of the "plan" ... was to acknowledge certain shortcomings at Tankport, and to request a six months' deferral.

B1029. "Significant changes" were recommended, including paving the tank basins, installing a surface water collection and pumping system and an oil separator system for surface water, replacing tank bottoms, removing abandoned piping and replacing operational underground piping. B1029. Kaulakis characterized the status quo as "keeping one step ahead of the sheriff, i.e. taking whatever actions are necessary, and grudgingly, when forced to by regulations or circumstances." B1034.

The Environics study and this statement by Kaulakis are dispositive. Pittston cannot plausibly deny that it knew that there was an ongoing offsite and groundwater contamination problem as of the 1979 report. A reasonable jury could not fail to find that Pittston had a subjective expectation of pollution damage as of that date. Therefore, pollution damage caused by Pittston's activities after that date are not within the definition of an occurrence in the CGL policies, and liability for those activities are not a covered loss.

 The Court does not believe, however, that the internal correspondence pre-dating the Environics report is as conclusive. It must be remembered that these were reports of junior officials attempting to induce their superiors into taking decisive action. One declarant has testified that there was an element of hyperbole to them. Foster Dep. at A1303. It is reasonable to infer that their superiors may have discounted some of the statements as alarmist. *See* Coleman Dep. at A555, A567. Moreover, it is not clear whether the reports cited above actually announce that Tankport was presently in violation of effluent limits, or whether it was anticipated that, upon a regulatory inspection or impending stricter regulation Tankport would be in a state of non-compliance. Nor do the reports disclose what formed the basis for the junior officials' knowledge. After the Environics report, these questions are moot. Before the date of the report, the impact of the internal correspondence on whether the appropriate decision makers expected or intended the damage at issue is for a jury to evaluate.

The Court will grant summary judgment as to only a fraction of Travelers exposure in this case. The evidence that Pittston expected contamination as of the late seventies does not justify summary judgment that the insured's activities should have led it to expect or intend off-site or groundwater damage before that period.

Of course, the clear inference of the pervasive environmental damage found by the Environics study is that the leakage of oil to the groundwater and into Caven Creek had been occurring for many years previously as a product of intentionally sloppy housekeeping practices at Tankport. However, that evidence is contradicted by the testimony of Pittston employees who maintain that they were conducting regular housekeeping and clean-up activities.

Moreover, it appears undisputed that the contamination of the site may have come from the activities of earlier owners of the site. The record suggests that it is likely that some portion of the pollution is the result of the Eagle Works activities. First, the continuous trigger theory requires that pollution damage that is ongoing or manifested during the policy periods as a result of this previous industrial use would be within the definition of an occurrence. Second, the problem of the buried pipes did not surface until the 1980's. Thus, there is scant evidence before the Court that, in 1954, Pittston was aware of the extent or the implications of Eagle Work's contamination of the site.

 Travelers offers two pieces of evidence to contradict this view. It offers the expert testimony of a hydrogeologist John B. Robertson who avers that he has examined aerial photographs of the site taken between 1940 to 1980.[12] Robertson claims that the photographs reveal that the site was contaminated with oil from the time the first photo was taken. Furthermore, he avers that an oil sheen was visible on New York Harbor in each decade except the 1950's. Travelers also submits the testimony of Shivey, who started work as a laborer at Tankport in the 1940's. Shivey testifies that there was a sheen on the harbor around the site from the day he began there. Shivey testified that "It seems like it's coming out of the shoreline and just blends into the water."

While this evidence may be persuasive to the fact finder at trial, it falls short of establishing under the summary judgment standard that Pittston expected or intended pervasive environmental damage. As to Robertson's testimony, the Court believes that the fact that a hydrogeologist reviewing aerial photographs sees evidence of petroleum contamination does not compel the conclusion that the Pittston officials on the ground knew that oil was seeping into the groundwater or into New York Harbor from abandoned equipment hidden around their site or from their operation. As to the sheen on the water, Pittston argues reasonably that New York Harbor is a heavily used industrial

12. Pittston moves to strike this affidavit on the grounds that Robertson has not established his expert status in the field of interpreting aerial photographs. Federal Rule of Evidence 703 allows experts to testify as to their opinions as long as the evidence is based on knowledge gained through sources "of a type reasonably relied upon by experts." Robertson avers that aerial photographs are relied upon in his field. Robertson Aff. ¶ 2. Therefore, Pittston's motion to strike will be denied.

waterway, and there is no definitive evidence that Pittston officials 1) were aware of the sheen, or 2) that they were aware that the sheen observed was caused by Tankport. Clearly, Shivey's casual observation is not dispositive.

Thus, Pittston may well argue that it was unaware of the latent potential for the release of oil that was inherent in the Tankport site. Certainly the seeping of Eagle Works petroleum contributed to the property damage. The facts show that this damage might well not have been "expected nor intended" by Pittston. Travelers may contend that by the simple fact of the site's long involvement with large scale petroleum industry that Pittston expected that there would be damage. However, the same argument can be used against the insurer. Notwithstanding the notorious history of the site, Travelers chose to underwrite the risk. They cannot use this notoriety against their insured at this late date.

For these reasons, the question of Pittston's subjective intent concerning the true state of Tankport's apparent contamination before 1979, and the ultimate question of whether, during the earlier policy periods, Pittston expected or intended the damage at issue are the subject of genuine dispute and may not be decided on summary judgment.

### E. Defenses to Coverage
#### (i) Late Notice and Defense Costs

Travelers maintains that Pittston failed to give notice of Ultramar's claim against it in timely manner and is thereby precluded from coverage. As with any policy, there was a provision requiring prompt notice to Travelers of any claim against Pittston. Travelers argues that the April 4, 1990 notice by Pittston was late, whether one considers the delay to be five years from the time from Ultramar's 1985 claim for chromium contamination, or eight months from Ultramar's August 1989 proposed amended complaint. Travelers Brief in Opposition to Pittston's Summary Judgment at 25. Travelers further argues that Pittston should have given notice of each "occurrence" which they would define as each spill, or discovery of oil on the site.

It is not easy for an insurer to raise a valid defense of late notice under New Jersey law. The insurer must show "appreciable prejudice." *Hatco,* 801 F.Supp. at 1371–72. The measure is whether the insurer can establish that "substantial rights have been irretrievably lost." *Chemical Leaman Tank Lines,* 817 F.Supp. at 1158. Travelers contends that it is prejudiced because the settlement entered into was unreasonable and Pittston had no real obligation to Ultramar. Further, Travelers claims that it is prejudiced by late notice because it has lost access to evidence as to the timing and nature of the events at Tankport.

The first argument has been discussed in connection with the voluntary assumption of obligations issue. To recapitulate, independent review of the merits of Ultramar's claim against Pittston shows that the settlement was reasonable. The certification of Judge Meanor on this issue is not persuasive to the contrary. The terms of the stock purchase agreement are dispositive on the issue. Travelers' contract construction argument here has already been disposed of in the voluntary assumption of obligations discussion.

The argument that Travelers is prejudiced through the loss of access to evidence argument is without merit. This case concerns pollution that goes back at least thirty-five years. The time that passed between the various dates that Ultramar asserted claims against Pittston is insignificant in comparison to this amount of time. To the extent that Travelers is saying that Pittston should have notified it of each time it spilt some oil, then it is a re-hash of the "expected nor intended" argument, because it presumes that Pittston knew at the time that an insured loss was "occurring."

Travelers' counsel, at oral argument, claimed that underwriting information developed by the insurer's personnel in the early policy years is no longer available due to the late notice. The Court has several responses. First, this argument was not raised in the nearly 100 pages of legal memoranda Travelers has submitted to the Court, and so it must be deemed waived for purposes of this motion. Second, Travelers has not

shown that the underwriting information for these long-ago policies was available even as of the earliest date the insurer claims it was entitled to notice, the 1985 Ultramar claim.

Finally, Travelers has failed to satisfy the Court that any of its lost evidence would have improved its position with respect to denying coverage. Thus, the insurer has failed to establish prejudice, let alone that "substantial rights have been irretrievably lost."

 The date of the notice to Travelers of the claim by Ultramar against its insured will affect another issue, however; the duty to defend. There is no duty on the part of an insurer to defend until it receives notice of a claim. *SL Indus., Inc. v. American Motorists Ins. Co.*, 128 N.J. 188, 199–200, 607 A.2d 1266 (1992). It is undisputed that notice was provided to Travelers on April 4, 1990. Therefore, Travelers has no obligation to reimburse Pittston for defense costs incurred before that date. The Court assumes that this will include all or nearly all of Pittston's defense expenses, because the settlement with Ultramar followed within days.

### (ii) Pollution Exclusion Clause

 Starting in 1971, the Travelers policies contained a pollution exclusion clause. The standard policy form reads:

This insurance does not apply: (f)(1) to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any ... pollutant

(i) if such emission, [etc.] is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable, or

(ii) resulting from or contributed to by any condition in violation of or non-compliance with any governmental rule, regulation or law applicable thereto: but this exclusion (f)(1) does not apply to property damage arising out of any emission [etc.] of petroleum or petroleum derivatives into any body of water:

(2) to property damage arising out of any emission, [etc.] of petroleum or petroleum derivatives into any body of water, but this exclusion (f)(2) does not apply to property

damage resulting from fire or explosion arising out of an emission, [etc.] which neither

(i) is expected or intended from the standpoint of any insured ..., nor

(ii) results from or is contributed to by any condition in violation of or non-compliance with any governmental directive [etc.].

The parties agreed to modify section (f)(2) to read:

(2) to property damage arising out of any emission [etc.] of petroleum or petroleum derivatives into any body of water, if such emission [etc.]

(A) is not sudden,

(B) is either expected or intended from the standpoint of any insured ...

(C) results directly from any condition in violation of, or non-compliance with any governmental rule, regulation or law ..., nor in any event, to water, including expense to clean up water, or to prevent such petroleum, or petroleum derivative from reaching shore.

Strapp Decla. Exhibit I.

Section (f)(1) is modeled on what is known as the "Travelers Pollution Exclusion." Ostrager & Newman, *supra*, § 10.02[b] at 356–57. The modified section (f)(2) is what is known as a manuscript endorsement, because it was drafted specifically for this insurance contract.

The first task is deciding whether section one, section two, or both are controlling here. Section two has the more limited scope; it is directed to discharges "into any body of water." Therefore, spills onto the ground or seepage into the ground from leaking pipes would be governed by section one. Moreover, the Court is of the opinion that the escape of oil into the groundwater would be within section one, because groundwater is not a "body of water" within the plain meaning of that term. Indeed, Travelers' own engineers recognize groundwater contamination as a type of land pollution. B544.

 The question immediately arises whether oil that is spilled onto the ground and seeps from there into Caven Creek or

the New York Harbor would be within section one or two. The Court concludes that the language of the clause mandates that the immediate location of the discharge determines which section of the pollution exclusion clause will control. The unfortunate fact is that when pollution escapes into the ground it is likely to find its way to any nearby water, and when it escapes into water, it will probably end up fouling some piece of ground. This unfortunate event should not serve to defeat the parties' attempts to segregate the types of discharges.[13]

Therefore, with the possible exception of alleged discharges of oil from the oil/water separator directly into Caven Creek, the contamination in this case is governed by section one of the pollution exclusion.

■■■ Section (f)(1)(i) bars any recovery where the discharge of pollutants is expected or intended. As Judge Becker explains in *New Castle County v. Hartford Accident and Indemnity Co.*, 933 F.2d 1162 (3d Cir.1991), the key difference between the pollution exclusion language and the "expected nor intended" of the occurrence definition is first that, for the exclusion, the issue is whether the discharge is expected or intended, whereas, in the occurrence definition, it is whether the resultant damage is expected or intended. *Id.* at 1199. A second difference flows from the fact that it is the insurer's burden to demonstrate that an exclusion applies. *Id.* at 1181; *Diamond Shamrock*, 258 N.J.Super. at 216, 609 A.2d 440. Therefore, unlike for the occurrence definition, it is the insurer that must demonstrate the expectation or intention of the insured to discharge pollution.

The evidence on this issue significantly overlaps that which is relevant to the occurrence definition, despite the conceptual distinction between that issue and the pollution exclusion's focus on discharge.[14] Pittston contends that it was a well-run operation in

relation to the prevailing standards. Travelers points to evidence of Pittston's knowledge that there was oil in the ground at Tankport. Moreover, Travelers maintains that Eagle Works was a "person or organization for whose acts or omissions any insured may be liable." Travelers suggests, plausibly but without any particular foundation, that Eagle Works expected or intended to discharge oil.

Thus, the record is inconclusive. It may be that, before the damage became expected or intended in the late 1970's, Pittston was taking great pains not to spill its product. The damage documented by Environics may have been caused by previous, unwitting discharges. It is even uncertain and unsubstantiated that, after the Environics study told Pittston that its operation was causing environmental damage, the responsible officials were aware and able to discover any particular discharge that might be causing the problem.

This issue poses another question. If some level of spillage was an inevitable incident of running an oil terminal under the prevailing standards of the 1960's and 1970's, and the insurer knew or may be charged with knowing this fact, is this loss of oil a "discharge" or expected or intended under the language of the policy? As Pittston engineer Mootz testified: "An oil terminal is not—it's not a drugstore operation." Mootz Dep. at 2528. The regulations permitted, and no doubt still permit, a certain amount of oil discharge that represents a compromise between environmental goals, technical feasibility and economic reality. *See* Mootz Dep. at 2528. Looking to the reasonable expectations of the parties, the insured purchased coverage for the risk that his everyday operations would expose him to liability. Under this argument, the loss of oil that, by the standards of the day, were part of normal

---

**13.** The Court notes that this rationale would provide an alternative basis for finding that the groundwater contamination is not within the scope of section two of the pollution exclusion.

**14.** The Court does not go as far as some commentators who believe that *Morton* has merged the occurrence definition and the pollution exclusion clause. *E.g.*, Michael E. Petrella, Comment,

*Back to the Future for the Pollution Exclusion Clause?: Morton International, Inc. v. General Accident Insurance Co.*, 44 Case W.Res.L.Rev. 265, 303–04 (1993). *Morton* itself explicitly preserves the distinction recognized in *New Castle County*, 933 F.2d at 1162, that the exclusion clause concerns discharge, rather than damage. *Morton*, 134 N.J. at 78, 629 A.2d 831.

daily operations, constituted an element of the risk the insurer accepted.

A similar argument was addressed in *Marotta Scientific Controls, Inc. v. RLI Ins. Co.*, 1990 WL 359763 (D.N.J. June 4, 1990). There a manufacturer recycled solvents on its own site over fourteen years. In the course of this operation, solvent was spilled from corroded drums, drums punctured by forklifts, corroded piping and gaskets in the recycling equipment, and general accidents. *Id.* at *2. The insurer argued that this sloppy housekeeping meant that the management expected the escape of solvents into the groundwater and thus coverage was barred under a pollution exclusion clause. Holding that the clause did not bar coverage, the court found that the spills were actually fairly infrequent and that the insured took reasonable care in cleaning them up. *Id.* at *12.

The court in *Marotta Scientific* may have erroneously focused on the expectation of the insured as to whether environmental damage as opposed to mere discharge was expected or intended. Nonetheless, this case does provide support for the proposition that housekeeping measures that are objectively reasonable for the standards of the time may prevent operation of the pollution exclusion clause even though some pollution escapes incident to normal operations. Moreover, this rule is consistent with the concern, discussed above, that the insurers not be allowed to introduce concepts of negligence to exclude coverage under a policy whose very purpose is to transfer the risk of negligent loss.

This rule is consistent with the moral hazard rational of Judge Becker in *New Castle County*, 933 F.2d at 1202. Under the moral hazard argument, both a rational insurer and strong public policy would not provide coverage for the intentional discharge of pollution. Otherwise, polluters would have no incentive to avoid socially irresponsible behavior or avoid incurring covered liability. However, if the insured is undertaking precautions generally considered to be reasonable and effective under the current understanding of the time, *a fortiori*, it is acting responsibly and allowing coverage will not create the "moral hazard." Therefore, coverage for whatever discharge is an inevitable incident to the business the insurer has chosen to underwrite should be permitted, whether this incidental discharge is "expected" or not.[15] Only an expected or intended discharge that is in excess of what is normally incidental to the operation will trigger this pollution exclusion clause.

 The record on what Pittston knew as to its discharge of petroleum and when it knew it has been discussed in full already. Whether Pittston knew that it was discharging petroleum in excess of the normal operating standards of the day is the subject of genuine dispute up until the time of the Environics report. As to the Eagle Works contamination, the insurer has produced no evidence that the previous operator expected or intended to discharge oil. Furthermore the Court rejects the proposition that Eagle Works would be an entity for whose "acts or omissions" Pittston may be held liable within the meaning of the exclusion clause. Pittston is liable for the oil now in the ground, without regard to how it got there. The acts or omissions of Eagle Works are irrelevant to Pittston's liability.

 Subsection (f)(1)(ii) excludes coverage for pollution "resulting from or contributed to" by a violation or failure to comply with the law. Pittston claims that it was never cited by any governmental authority for being in violation of applicable regulations or statutes. Travelers disputes this as a statement of fact, *see* B236–37 (log of spill incidents including fines levied by Coast Guard), but also contends that a violation that would trigger this exclusion need not be one that the government has chosen to prosecute.

Travelers' analogy to a car going sixty miles per hour in a school zone has already been discussed with regard to the effect of non-compliance on the question of the "expected nor intended" clause of the occurrence definition. Travelers Brief in Opposition to Pittston's Summary Judgment Motion at 35 n. 41. It has more bite in this branch

15. Perhaps a better way of stating the argument is that such an inevitable discharge is not even a "discharge" as measured by the reasonable expectations of the parties.

of the case because the issue is presented differently. With regard to the occurrence clause, regulatory compliance was an element of the objective evidence that the insured subjectively expected or intended the property damage. Here, even though it is the insurer's burden, once it is shown that a condition that caused the discharge is in non-compliance, the loss is excluded directly under the terms of the policy.

Thus, questions of the parties reasonable expectations or moral hazard are not applicable here. If the insured establishes a non-complying condition, then the loss is excluded whether the government or the insured were aware of the violation or not. It is closer to the hypothetical of the speeding driver, because the violation may be assessed under the literal terms of the regulations in force.

As stated, this analysis appears to provide ample opportunity for the insurer to avoid coverage. Pollution is illegal, and for much, if not all, of the liability for which polluters seek indemnity, the obligation to pay is imposed by the same laws which establish standards of compliance. However, this view overlooks the narrowness of the literal terms of the exclusion. As this Court reads the exclusion, the non-compliance must be in a condition that causes the discharge. *Accord Travelers Indemnity Co. v. Dingwell*, 414 A.2d 220, 228 (Me.1980) (construing identical language). A discharge that itself violates the regulations is irrelevant. Thus, for example, if the effluent from the oil/water separator contained more oil than allowed under the regulations, the exclusion would not be triggered. Only if there is a regulation that provides that the type of separator is itself a non-complying condition, and if the discharge actually "results from or is contributed to" by the separator, will it operate to excuse the insurer.

Although not strictly necessary to the holding today, the Court adds that it is not every non-complying condition that will trigger the pollution exclusion clause, even if it is linked by causation to a discharge. For the further guidance of the parties, the Court states its opinion that only a non-complying condition that is a substantial contributor to a significant portion of the overall contamination will justify excluding coverage under this clause. The Court will not give credence to

the spectacle of an insurer pouring over every misdeed of an insured decades after the fact. Such a result would run too far contrary to any insured's reasonable expectations of coverage. De minimis infractions will not suffice.

Travelers cites the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1251 *et seq.*, enacted in 1970, and regulations promulgated pursuant to that statute, which prohibits the discharge of oil into navigable waters. The regulations make it a violation to discharge oil such that it creates a visible sheen upon the water, or causes a sludge to be discharged below the surface. Travelers asserts that in 1972 the FWPCA was amended to require reports of ongoing discharges of pollutants but that Pittston never made any such report. However, assuming the truth of this allegation, the failure to report a discharge does not cause or contribute to the discharge as required to trigger the exclusion clause.

Other of Travelers' contentions as to specific conditions that it maintains were in violation of the law are unsupported by the record. For example, Travelers maintains that the tank basins that were not lined with impermeable liners were a violation. However, 40 C.F.R. § 112.7(c) provides that impermeable liners are one of seven different prevention systems. The use of only one would constitute the minimum requirement to prevent oil from reaching a navigable waterway. *Id.* Sorbent materials, which Pittston claims it did use, is also listed. *Id.* § 112.7(c)(1)(vii). NJDEPE correspondence indicates that, while it disagreed with Pittston's assessment of the practicality of impermeable liners under the tanks, the agency would consider other methods if the cost were prohibitive.

Travelers cites the 1974 S.P.C.C. Plan, which says: "It is realized that this plan may be deficient in part, however, due to the impending takeover of this property by Jersey City, the initiation of remedial measures is deemed imprudent." B619. Travelers argues that, with this statement Pittston, "baldly admitted that Pittston would flaunt the [ ] requirements and continue to pollute." Travelers Brief for Summary Judgment at

12. The Court finds this characterization overstates the case. Moreover, it stops short of identifying a specific, non-complying condition that resulted in or contributed to pollution.

■ For the reasons discussed, the Court will deny summary judgment to Travelers based on section one of the pollution exclusion clause. The evidence is insufficient as to whether Pittston expected or intended to discharge pollutants before the date of the Environics study. Of course, after the study the issue is moot, because, as a matter of law, there was no covered occurrence. Likewise, the insurer has not produced sufficient evidence of conditions at Tankport that were not in compliance with the law and that are causally linked to the discharges of pollutants there.

This leaves only the question of the oil/water separator discharges into the drainage ditch that led to Caven Creek. First, as discussed with regard to the expected or intended requirement of the occurrence clause, the Court finds that there is a genuine issue of fact as to whether the separator discharged oil, or only "clean" water as it was supposed to do. The Court understands that significant contamination now exists in the Caven Creek area, but it is unclear at this point how much may be attributed to the separator and how much to seepage from Tankport operations and the Eagle Works legacy.

Second, the Court finds that the record is insufficient to rule even on the issue of whether this would constitute a body of water. The Court has not been informed of the nature of Caven Creek. It appears relevant to know, *inter alia*, whether this is a flowing stream, a dry waterbed, or tidal estuary. The Court has no firm evidence that it communicates with New York Harbor. Moreover, it has not been thoroughly briefed whether any of this makes a difference under the law.

Finally, it should be noted that, although denying summary judgment to the insurer on this issue, the Court is not granting it to the insured. As with the expected or intended occurrence definition issue, the stage appears to be set for a showing by the insurers on their burden under the pollution exclusion

clause. However, with regard to the pre-1979 policies, the Court holds that this showing must be made to the trier of fact, as there is a genuine and material dispute on these issues.

### (iii) Owned Property Exclusion

■ Like many CGL policies, the Travelers policies exclude from coverage damage to the insured's own property. Pittston makes the following arguments as to why it does not bar coverage here. First, it claims that there is off-site contamination both on the surface and due to migrating groundwater pollution. Second, Pittston claims that the groundwater under Tankport is considered the property of the state, and therefore not "owned property."

■ Under New Jersey law, clean up of owned property is covered under a CGL policy when the clean up is necessary to prevent contamination of other property. *State v. Signo Trading Int'l, Inc.*, 130 N.J. 51, 62–63, 612 A.2d 932 (1992) (citing *Summit Assocs. v. Liberty Mutual Fire Ins. Co.*, 229 N.J.Super. 56, 64, 550 A.2d 1235 (App.Div. 1988)). This doctrine has been described as a "narrow exception" to the owned property exclusion. *Id.* at 64, 550 A.2d 1235. Where the remediation is to be undertaken on the insured's owned property, a prima facie case exists for application of the owned property exclusion. The insured then has the burden of showing actual, off-site damage caused by on-site contamination, and an imminent and immediate threat of continued off-site damage, before it can claim coverage for remediation of its own property. *Id.; Hatco*, 801 F.Supp. at 1361.

Here, Travelers has disadvantageously cited examples of oil in Caven Creek, which is not on the property of the insured, in connection with its expected or intended argument. The issue of off-site pollution associated with the oil/water separator has also been raised. Pittston submits testimony that there is now off-site ground water pollution, and there is more contaminated ground water that is migrating off-site at the rate of ten to two hundred feet per year. Roland Decla. ¶¶ 18–21. The underground pools of oil are migrating off the site as well. *Id.* ¶¶ 25–28. The Court holds that this evidence establishes

sufficient off-site contamination, and an imminent and immediate threat of further off-site contamination to warrant an exception to the owned property exclusion in this case.

This Court considered the *parens patriae* argument in *Hatco* and found that it was an open question under New Jersey law whether the State had a property interest in groundwater for the purposes of the owned-property exclusion in insurance policies. Since then, the issue has been addressed by two New Jersey trial courts with conflicting results. In *Reliance Ins. Co. v. Armstrong World Indus.*, 259 N.J.Super. 538, 614 A.2d 642 (1992), cited by Travelers, the court found that the property interest in groundwater resided in the title holder of the surface land. This holding was disagreed with in *UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co.*, 276 N.J.Super. 52, 60–61, 647 A.2d 182 (Law Div.1994). There, the court found that the State's codified policy of protecting groundwater from contamination means that the proprietary interests in the groundwater exceeds those of the title holder of the surface land. *See* N.J.S.A. 58:10–23.11c–d, 58:10A–6, 58:10A–18.

Moreover, the *UMC/Stamford* court reasoned:

> by its very nature, groundwater is a migratory fluid which uncontrollably seeps through porous soil particles. Therefore, because under such circumstances it is nearly impossible to naturally contain such a water source, as well as any contaminants or pollutants subsumed within its path, it would be unreasonable simplistically to assign ownership rights strictly on the basis of water that may only momentarily be coursing and flowing below a property's surface.

*UMC/Stamford*, 276 N.J.Super. at 61, 647 A.2d 182.

Accordingly, the court held that coverage for groundwater contamination was not barred by the owned property exclusion. This reasoning is persuasive. As a matter of reasonable expectations, a surface property owner does not believe that he has sole property rights in ground water beneath his property. The public policy importance of ground water leads to the conclusion that there is an interest, distinct from the property owner's, in the ground water. The Court notes that the Appellate Division has recently held in accord. *Morrone v. Harleysville Mutual Ins. Co.*, 283 N.J.Super. 411, 418–20, 662 A.2d 562 (App.Div.1995).

Travelers maintains that the qualification to the *Signo* exception, that there be actual damage to off-site property, bars coverage in this case. They argue that here the off-site damage is not certain enough, because clean-up efforts have not yet begun and costs allocable to preventing further off-site damage have not been determined. Travelers points out that the claims made here are not by other property owners, but by NJDEPE, who would make the claim regardless of whether the damage was on Tankport land or other land.

Travelers' arguments fail on this point. Although the certainty of off-site harm is an important element in showing that the coverage is a reasonable expectation of the insured, the cases do not hold that there must be a claim raised by a neighboring landowner to trigger this expectation. Here, there is concrete evidence that the groundwater has migrated, and that the oil/water separator contamination exists off-site. Thus, "present injury has already been demonstrated." *Signo*, 130 N.J. at 64, 612 A.2d 932. Therefore, the Court will rule as a matter of law that the owned property exclusion does not bar coverage in this case.

## F. The Fortuity, Known Loss and Loss in Progress Doctrines

Travelers also argues that coverage is barred under the doctrines of fortuity, known loss and/or loss in progress. Travelers argues that the known loss doctrine precludes coverage in this case, because Pittston knew as of the date it bought Tankport that environmental damage was already occurring there. It further points to the enactment of environmental statutes and specific accidents at the site. Travelers argues that "if Pittston entered into a new policy knowing of a loss incurred in a prior year, that loss is not a fortuity and is not covered under the subsequent policies." Travelers S.J. Brief at 21.

Travelers' statement of the issue shows that it considers the known loss issue to be

essentially the same as the question of whether the insured expected or intended the environmental damage under the occurrence definition. As will be set forth in more detail below in connection with Insurance Company of North America's motion for summary judgment on the basis of known loss, the Court believes that Travelers is correct. Because the "expected nor intended" issue has been exhaustively explored *supra*, it will not be repeated here. The Court holds that summary judgment will not be granted on the issue of known loss for any policy that began before the date of the Environics report.

### G. Summary

Like dry land at Tankport, moral high ground is scarce in this case. Nonetheless, each party has managed to find its own small rise from which to shout the iniquities of the others. On the one hand, Pittston appears to have presided over an industrial site with disastrous consequences for the environmental health of our community and now disavows knowledge of the harm that seemingly must have been taking place during its aegis. On the other, Travelers accepted premiums for over twenty years and now seeks to avoid coverage of its insured, and likewise disclaims prior knowledge of the nature of this notorious site. The Court believes that the issue of whether and when Pittston expected or intended the environmental damage is best pictured as a continuum. As the years wore on, the unpleasant facts surfaced one by one, until there came a day when Pittston could no longer maintain a convenient ignorance of Tankport's condition.

The Court has found that, as of the Environics report, no reasonable juror could fail to find that the day had arrived. Moving backward in time from that date, the moment where realization actually materialized, is a matter for the trier of fact. Moreover, as it is apparent that there must be a trial in this matter, the Court is reluctant to rule aggressively as a matter of law when it is inevitable that the record will be augmented. Thus, although summary judgment is denied today as to the bulk of the Travelers policies, the Court cannot rule out the possibility that a summary ruling may be feasible on a fuller record.

As to those policy years in which reasonable fact-finders may disagree, a jury trial is the most appropriate forum. The fields of insurance and industrial pollution are intertwined with the public interest. As to these greyer areas the moral sense of the community, as embodied by a jury, should control.

### 3. The Other Insurers

#### A. CMLP Policies

■ The CMLP policies were purchased late in Pittston's tenancy of Tankport, beginning in 1978. They were terminated in 1984. On their face, their primary focus appears to be for marine losses, such as damage to vessels or docks. Pittston claims that there is coverage for the clean-up of the site as well.

The different companies that subscribed to the policies are listed, *supra*, at note 2. Wausau has submitted its own omnibus motion. The other CMLP insurers have adopted a strategy of submitting separate motions on discrete issues. Because the Court finds that Pittston's claim for coverage under the CMLP policies fails on a threshold issue of policy construction, the Court need not reach these other issues and those motions will be dismissed as moot.

All of the policies are structured in two parts. Part one is titled "General Policy Terms and Conditions." This part has a preamble that states: "Unless otherwise specified, the following Terms and Conditions are deemed incorporated under all sections of this Policy." Section II[16] of Part One states:

> This Policy is to cover any loss, damage, liability and/or expense that the assured shall be liable to pay and/or shall pay or sue and labor, arising out of, or in consequence of, the actual and/or potential discharge, emission, spillage, or leakage upon or into the seas, waters, land or air, of oil, petroleum products, chemicals or other

---

**16.** Part one is broken into sections headed by roman numerals. The sections of part two are lettered.

substances of any kind or nature whatsoever.

C3. This provision is limited to exclude loss rising from and act of war, governmental negligence, willful negligence or misconduct of the insured's senior executives, punitive damages, and insured losses from owned or bareboat chartered vessels. C4.

Part Two is headed "Specific Policy Terms and Conditions." The number of sections varied from year to year, but three sections, titled "Charterer's Liability," "Wharfinger's Liability," and "Cargo Liability," appear in each. As their names suggest, these sections grant coverage for liability incurred arising out traditional marine risks, such as the charter of vessels, and the operation of the wharf, terminal or landing.

The gist of this controversy is that Pittston claims that section II of part one is a "standalone" grant of coverage in accordance with the sweeping language of the passage quoted above. Because that section specifically refers to the discharge of oil "upon or into the seas, waters, land or air," Pittston argues that it is covered for the escape of oil from any place onto the soil and thence into the groundwater. The insurers, on the other hand, claim that section one does not provide an independent grant of coverage. They maintain that section two, the "Specific Policy Terms" section, is the controlling section for determining which activities of Pittston are covered. Part one, according to them, only defines the extent or type of the coverages granted in part two.

In *Pittston v. Allianz Ins. Co.*, 795 F.Supp. 678 (D.N.J.1992), this Court considered the impact of the policy language on the choice of law issue. The Court wrote that:

To the extent the Pollution Clause provides stand alone coverage, it too would be governed by New Jersey law. The CMLP policies do not unambiguously provide stand-alone coverage. But without resort, at a minimum, to extrinsic evidence of practice and custom in the marine insurance trade, the language of the policies alone does not preclude a finding of stand-alone coverage.

*Id.* at 691. It is important to note, however, the limited nature of this holding. The Court stated clearly that it would "not at this time, at this early stage of the case, decide the substantive issue of whether the policies provide stand-alone pollution coverage." *Id.* at 692. The Court specifically refused to consider extrinsic evidence and the arguments of the parties, on the grounds that such an analysis would be "premature." *Id.* at 691–92. The holding was carefully circumscribed to raise only a rebuttable presumption that New Jersey law would apply, based on the fact that the location of the risk was New Jersey even though the location of the " 'insured' risk," *i.e.*, marine or non-marine, was as yet undetermined. *Id.*

Unlike in the choice of law opinion, here the Court's determination of the proper interpretation of the contract will determine the ultimate issue of coverage. Bearing in mind the importance of this threshold issue, the Court will proceed with more than its usual caution. The Court is satisfied that the record on this point is now fully developed. Therefore, the Court will address this issue *de novo*.

The Court finds that the CMLP policies do not provide coverage for land-based pollution. After a close reading of the plain language of the policies, consideration of their structure as a whole, and application of well-established rules of contract interpretation, the Court finds that the agreements are not ambiguous and that section two of part one clearly does not provide stand-alone pollution coverage. The Court has also carefully considered the extrinsic evidence offered by the parties, and it finds that the record does not establish that the contract language harbors any latent ambiguity. Finally, even assuming that the Court were to find the policies ambiguous, the extrinsic evidence in the record supports the finding that there is no independent grant of land-based pollution coverage.

The law concerning the construction of insurance contracts is well developed in this state. The ordinary insurance contract is interpreted under somewhat different rules than other agreements. For example, the doctrines of *contra proferentum* and the reasonable expectations of the insured have a special primacy where an insurance contract is ambiguous. *Oritani Savs. & Loan Ass'n*

*v. Fidelity & Deposit Co. of Md.,* 989 F.2d 635, 638 (3d Cir.1993). This is due to the technicality of insurance contracts, and their character as contracts of adhesion due to the typically unequal bargaining power between the parties in most of these transactions.

However, where the insured is powerful and sophisticated this rationale is attenuated. Where an insured has significant bargaining room and experience with this type of contract, "New Jersey law proscribes [the court] from straining to construe insurance policies to provide insurance coverage." *Oritani,* 989 F.2d at 642–43; *Werner Indus., Inc. v. First State Ins. Co.,* 112 N.J. 30, 38, 548 A.2d 188 (1988). "[C]ourts should only resort to the doctrine of reasonable expectations only when 'the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage.'" *State v. Signo Trading Int'l, Inc.,* 130 N.J. 51, 62–63, 612 A.2d 932 (1992) (quoting *Weedo v. Stone–E–Brick, Inc.,* 81 N.J. 233, 246–47, 405 A.2d 788 (1979)). Often, as in this case, the "average policyholder" must be considered to be a large corporation guided by in-house professionals and outside brokers. Accordingly, "the insurance policies of large corporations are to be construed like any other contract." *American Casualty Co. of Reading, Pa. v. Continisio,* 819 F.Supp. 385, 396 (D.N.J.1993), *aff'd,* 17 F.3d 62 (3d Cir.1994); *Pennbarr Corp. v. Insurance Co. of N. Am.,* 976 F.2d 145, 151 (3d. Cir.1992).

The determination of whether ambiguity exists is the first step in examining an insurance contract. "When the terms of an insurance contract are clear, ... it is the function of a court to enforce it as written and not to make a better contract for either of the parties." *State v. Signo Trading Int'l, Inc.,* 130 N.J. 51, 63, 612 A.2d 932 (1992) (citation omitted). The Court will not "torture" the language of the contract to create ambiguity where none exists. *Pennbarr Corp.,* 976 F.2d 145, 151 (3d. Cir.1992). Even where the facts suggest that the policy is a true contract of adhesion, the Court "should not write for the insured a better policy of insurance than the one purchased."

*Longobardi v. Chubb Ins. Co. of N.J.,* 121 N.J. 530, 537, 582 A.2d 1257 (1990).

Determining whether there is ambiguity in a contract is a question of law for the Court. *International Union, United Auto. v. Mack Trucks, Inc.,* 917 F.2d 107, 111 (3d Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). Complexity alone will not create ambiguity. *Pennbarr,* 976 F.2d at 151. The insured must do more than suggest a possible alternative reading of the contract. *New Castle County,* 933 F.2d at 1182. The insured's interpretation must be an "objectively reasonable reading of the disputed passage." *Id.*[17]

The Third Circuit recently revisited the issue of ambiguity and the use of extrinsic evidence in contract interpretation in *American Cyanamid Co. v. Fermenta Animal Health Co.,* 54 F.3d 177, 181–82 (3d Cir.1995). Extrinsic evidence always may be considered to determine whether ambiguity exists in a contract. *Id.; see also Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 362–63 (3d Cir.1987). "[T]he law recognizes that the meaning of words depends on context, and that what may seem unambiguous without context ... may be ambiguous when understood from 'the linguistic reference point of the parties.'" *American Cyanamid,* 54 F.3d at 181 (quoting *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980)). Of course, upon a finding of ambiguity, the extraneous evidence may also be considered to determine the true content of the parties' agreement.

With these principles in mind, the Court turns to the policies at hand. It is clear both from the policies' title and from their structure that these were package policies. It is generally understood that this type of policy is one in which an insured may contract for a package of various specified risks under one policy as its needs require. Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 5.1(d) at 466–67 (1988). For example, without changing part one, Pittston added to part two a section covering "Bailee and

---

**17.** Although Judge Becker was construing the law of Delaware in *New Castle County,* the Court is satisfied that New Jersey law is in accord with this basic principle.

Warehousemens Legal Liability" and "Open Cargo" in the 1980–81 policy year. C27. "Coverage on Owned Barges" was removed for 1983–84. C213. While the title "Marine Package Program" does not require the finding that only marine risks are covered, the custom-made nature of a package policy undermines the argument that its construction should be biased toward coverage.

Furthermore, the two part, "package" structure of the policy supports the conclusion that the sections of part one did not stand alone. As the years wore on, the structure of the policy allowed various grants of coverage to be moved into and out of part two, while the umbrella of part one's "General Policy Terms" remained constant. The statement of general principles obviated the need to repeat them in each specified risk section. The architecture of the policies strongly suggests that the "package" of covered risks was embodied in part two, and that, to continue the metaphor, part one was merely the string that tied the bundle together.

The Court next considers the text of the policies. Part one contains several other numbered sections besides the pollution clause. Comparison of the pollution clause with these others in the same part is illuminating. For example, section I states that "Subject to the conditions of this policy; liability, loss, damage, and/or expenses arising out of any agreements to indemnify, hold harmless, and/or waive rights of subrogation entered into by the assured subsequent to Policy inception shall be held covered...." C3. Section III provides that "Coverage hereunder includes legal fees and associated expenses in the defense of any claim that might be made hereon." C4. The pollution clause lies between these (section II).

As the insurers point out, section I cannot stand alone, unless Pittston is claiming coverage for all possible liability or indemnity agreements, no matter what the underlying source of liability. A claim of such a broad grant of coverage would be unreasonable, and the insureds do not assert it. Similarly, section III on legal fees makes no sense standing alone. It cannot refer to any legal fee; the only reasonable explanation is that it refers to fees incurred in relation to claims for damage in one of the listed categories of part two.

Instead, the far more likely interpretation is that these general provisions of part one outline the type of coverage that is granted, whereas part two specifies where and how that coverage might be triggered. Other sections in part one are a deductible provision, provision for cancellation, and a payment schedule. These provisions are clearly not "stand-alone," but only operate with reference to some other grant of coverage, such as those in part two. The fact that the pollution clause of section II appears alongside these unquestionably general provisions strongly supports the reading that section II only defines the parameters of the coverage granted in part two.

Part one is headed by the sentence: "Unless otherwise specified, the following terms and conditions are deemed incorporated under all sections of the policy." As a positive statement of the purpose of the general provisions, this preamble serves an important narrowing function. Under this provision, each of the general provisions give content to the specific grants of coverage. It is true that the preamble does not directly negate the proposition that the general provisions provide independent coverage too. However, under the maxim *expressio unius exclusio alterius, see Reading v. Travelers Ins. Co.,* 24 F.Supp. 394, 396 (M.D.Pa.1938), *aff'd,* 104 F.2d 257 (3d Cir.), *cert. denied,* 308 U.S. 588, 60 S.Ct. 114, 84 L.Ed. 493 (1939), where it is specified that the general provisions are to be incorporated into the specific ones, the clear implication is that the general provisions do not grant coverage on their own.

Other of the classic maxims of contract interpretation suggest the same conclusion. For example, the Court should adopt an interpretation that will give each of the terms of a contract some meaning and effect. *J.E. Faltin Motor Transp. v. Eazor Express,* 273 F.2d 444, 445 (3d Cir.1959). However, if the general provisions stand alone, there is no reason that they should be incorporated into the specific grants of coverage and the preamble is surplusage. Likewise, specific provisions must control those that are more general. *Id.* Here, there are specific, fairly

narrow grants of coverage that follow the supposed general provisions that are sweeping in their scope. Conventional rules of contract interpretation hold that the more narrow grant should define the scope of the more general provision. The Court is aware of the pitfalls in the use of these hoary rules, *see* E. Allan Farnsworth, *Contracts* § 7.11 at 515 (1990), and does not rely on them blindly. Nonetheless, the fact that these rationales all point in the same direction provides additional support for the conclusion reached here.

A number of very improbable results would follow from the proposition that the general provisions provided stand-alone coverage. As the Court noted in its prior Opinion, these supposed grants of coverage would be the only ones to which a substantial deductible of $100,000 does not apply, pursuant to part one, section V. C4. The insurers point out another anomaly. In some policies a $15,000,000 policy limit was specified for the specific grants of coverage. *See* C144 (Policy Number D15252). By its terms, however, the limit would not apply to the pollution clause. These facts show that the insureds' version of the contract is not commercially reasonable.

██ Of course where, as here, a contract is unambiguous, whether it is commercially reasonable is not dispositive of its interpretation. The Court will not re-write an agreement on the ground of commercial reasonableness. On the other hand, when the alternative reading of a contract proposed by a party would be improbable between rational business people, the persuasiveness of the alternative reading to establish ambiguity is weakened. *See New Castle County*, 933 F.2d at 1182. Thus, the strange results that follow from plaintiff's theory of the contract are relevant, but only because they strongly undermine plaintiff's argument 1) that the contract is in fact ambiguous, or 2) that, if it were ambiguous, the parties could have intended the interpretation the insured now urges.

The Court now turns to the extrinsic evidence Pittston submits in support of its position. First, plaintiff suggests that the language in standard CMLP pollution exclusion clauses in use in the 1970's shows that part one is stand-alone. Pittston points out that, except for the key difference that one pur-

ports to grant, where the other excludes broad pollution clean-up coverage, the language is almost identical. If the exclusion is stand-alone, Pittston argues, then their part one pollution clause should be stand-alone too. The problem with this argument is that the conclusion simply does not follow from the premise. An exclusion is not "stand-alone" in the sense that a grant of coverage may (or may not) be. On the contrary, an exclusion is meaningless without an underlying grant of coverage. Therefore, the analogy to standard CMLP exclusion clauses fails.

Second, Pittston points to Ultramar's coverage under Policy DFSJ–100. C284–347. This policy was in effect from April 1983 to April 1984, and names both Ultramar and Pittston as insureds. Here, the same pollution clause appears as section G in part two, alongside the other, clearly stand-alone grants of coverage for marine risks. The insureds characterize as an admission the testimony of Stewart A. Holmes, a Lloyd's Underwriter who worked on the policy, that he understood DFSJ–100 to continue the insurance previously in place with no substantive change. C2444. Pittston contends that, if A–F are stand-alone, then subsection G is stand-alone. If subsection G is stand-alone in DFSJ–100, the insureds claim, then the same language appearing in part one of the earlier policies must be stand-alone too.

Here, the problem is with the premise. Assuming that there was no change in coverage when the pollution clause was moved from the part one to part two, a questionable proposition as will be discussed below, it does not necessarily follow that section G is stand-alone, just because it appears alongside section A through F within part two. The Court used this "analysis by association" technique *supra*, but recognizes that it has its limits. Here, if the single DFSJ–100 policy is indeed duplicative of the coverage of the several earlier CMLP policies, then either the listing of the pollution clause with the "general principles" in the first five CMLP policies is contrary to the associational technique of contract interpretation, or its grouping with the specific grants of coverage in the last policy year is inconsistent with it.

Given the greater number of years in which the pollution clause was grouped with undoubtedly dependant or non-stand-alone provisions of the policy, the insureds' argument cuts against them. Because the earlier CMLP policies appear not to grant stand-alone petroleum pollution coverage, and assuming DFSJ–100 was intended to offer no greater coverage, then the more likely conclusion would be that DFSJ–100's section G is not stand-alone either. However, as explained below, the Court is satisfied that in neither case is the associational technique of contract interpretation violated. Contrary to Pittston's assertions DSFJ–100 did not simply duplicate the coverage under the prior policies.

Finally, Pittston offers evidence of officials of the insured and the insurer on the contemporary understanding of the parties. Some of this evidence consists of testimony by officials of the various parties as to their belief at the time of contracting. The Court finds that this type of statement of subjective belief is entitled to the least weight of all the forms of extrinsic evidence that can be offered in aid of the interpretation of a contract. The purpose of a written agreement is to provide an objective indicator of the parties intent. Other contemporary events or acts by the parties may supplement the written document with further objective indicators of intent where necessary to cure ambiguity. However, although it cannot be said to lack all evidentiary value, a simple statement of what was in the mind of a party when the contract was signed is of dubious value and runs too far contrary to the policy behind the law of written agreements. Therefore, it is inherently too unreliable to rate highly in the catalogue of extrinsic evidence available for contract interpretation.

Moreover, here the testimony as to subjective intent offered by the insured is inconclusive or inconsistent. For example, the testimony of John Betz, the account manager for the James insurance brokerage in charge of the CMLP policies is cited by the insured. He testified that section I and II stand alone, but that the other sections of part one did not. Betz disavowed expertise in this area, was unable to give an example of how section I would operate standing alone, and could offer no basis for his understanding that

pollution clause was stand-alone other than his own belief that it did. A95–99. The testimony of Kevin Lally, also of the James brokerage, is similarly conclusory. A1917–31. *See generally* Plaintiff's Rule 12G Statement ¶ 99 (citing similar testimony).

The Court notes the extraordinary breadth of the coverage the insureds would have under their theory of the contract. Liability for all pollution, anywhere, for any cause would be covered under this "marine" policy, including, for example, "a spill from a tank tru[c]k in the middle of some western desert." Cacici Dep. at A322 (testimony of broker's official, Joseph Cacici). Pittston's vice-president for risk management, Frank Lennon testified that Ultramar was "amazed" at the low cost in relation to the breadth of coverage Pittston claimed that the policy represented when they learned of it while doing due diligence for the stock purchase. Lennon Dep. at A2100.

It is represented to the Court that a 1977 memo from Pittston to Lennon is the sole contemporary document concerning the issue of the first CMLP policy. This representation is clearly inaccurate as there are in fact other contemporary documents in the record. In any event, this memo characterized the CMLP policies as providing broad coverage for pollution liability from terminal operations. In a postscript, the author, Pittston vice-president Lennon, asked that the reader keep the fact of this coverage confidential. The memo said:

> As we were trying to put this program together, several large brokerage houses indicated such pollution coverage was simply unavailable and that higher limits for the rest of the marine program were obtainable but only at exorbitantly high prices.

B1103. While this evidence may show Pittston's belief as to what coverage it had bought, or hoped to buy, it undercuts the claim that it had an actual meeting of the minds on the issue with its insurer and that any supposed misunderstanding on its part was reasonable.

The possibility that Pittston might have reasonably understood that it had purchased first-party coverage for pollution for all of its

operations is also belied by the testimony of C.E. Lowney, the manager of Hartford's New York Ocean Marine Department who negotiated the initial policy. Declaration of C.E. Lowney, dated Sept. 10, 1993 ("Lowney Decl.") ¶ 1. Lowney testifies that he flatly rejected a proposal from Pittston's broker that Hartford cover pollution risk in excess of those incidental to the marine risks identified in part two. *Id.* ¶¶ 6–7.

Given the unusually broad coverage claimed, one would expect to see this reflected in the insurers' calculation of premiums. Courts recognize that the amount of the premium paid is probative where coverage is in dispute. *McNeilab, Inc. v. North River Ins. Co.,* 645 F.Supp. 525, 540 (D.N.J. 1986), *aff'd,* 831 F.2d 287 (3d Cir.1987). Contemporary documents, including a letter from the insured's broker, show that the premium was allocated between various risks, none of which include open ended coverage for pollution wherever it may occur. Affidavit of David M. Haggerty, dated Oct. 5, 1993, Exhibits C, D. Plaintiff's expert's opinion that package policies would have only a "bulk" premium is of no value in the face of the direct evidence to the contrary. Affidavit of George Stellwag, dated July 13, 1993, ¶ 48. Therefore, the fact that there is no mention of any premium allocated to pollution coverage, particularly when the scope of that risk would dwarf any of the other coverages that were discussed, is evidence that the insured never purchased nor received it.

Likewise, in contemporary documents cited by the insurers that purport to summarize the coverage granted, the broad pollution coverage now asserted by the insured is conspicuous in its absence. *See, e.g.,* B1178 (list of possible claims and where they would be covered in the policy dated Nov. 10, 1978, no mention of part one, section II); B1199 (telex summarizing coverage dated January 1978). In others, where pollution is discussed, the language is clearly couched in terms of insuring risks from Pittston's marine operations. *See, e.g.,* B1104–10 (memo dated Jan. 14, 1980).

When Ultramar took over, the CMLP picture changed. Ultramar insisted that the part one, section II be moved to part two. B22 (letter from Ultramar to Fred S. James & Co., dated May 18, 1983). Ultramar was apparently not satisfied that the policy as it was drafted granted all that Pittston claimed that it did. "[T]hey just wanted to make absolutely certain that the broad pollution coverage was spelled out to their own liking." Lennon Dep. at 2100. Internal company documents show that the insurers were concerned about their exposure for land based pollution in connection with the Ultramar renewal. B43. A memorandum states that underwriting information should be gathered, including: determination of governmental involvement and regulatory compliance, insured's practices with regard to equipment testing and inventory control, spill remediation measures, and, most significantly, whether samples had been taken at the site and with what results. B45–46.

In April 1984, the Hartford wrote to Ultramar and set forth the terms on which it would continue to provide coverage. B47. The insurer insisted on $15,000,000 limit for pollution liability. Whether coverage would be continued at all was conditioned on completion of surveys of the insured sites. In a May 1, 1984 letter, Hartford reiterated its concern and recommended the insurance be placed with a specialty environmental insurer. The CMLP program was not renewed further.

It is apparent from the record that moving the pollution clause from part one, section II to part two, section G was considered a significant development at least by Ultramar and the insurers. This severely undercuts Pittston's argument that DSFJ–100 and the policies pre-dating it provided identical coverage. Moreover, it provides persuasive contemporary evidence that it was the provisions in part two that granted coverage, and that, as long as the pollution clause remained in part one, it only defined the scope of the specific coverage grants. Only when it was moved to part two did the insurers contemplate the extraordinary scope of coverage now claimed by the insureds.

 Where an experienced insured could have but did not clearly provide for a certain coverage, that coverage should not be imputed to the policy. *McNeilab, Inc.,* 645 F.Supp. at 540. Here Ultramar knew how the policy had to be altered to provide stand-

alone pollution coverage. Pittston was at least as sophisticated an insured as Ultramar, and the Court presumes it possessed equivalent leverage to negotiate terms. Therefore, the fact that Ultramar insisted on and won a removal of the pollution clause from part one to part two is persuasive extrinsic evidence that the earlier, Pittston CMLP policies did not provide stand-alone coverage.

Pittston points to an April 4, 1984 internal Hartford memorandum as a smoking gun. It reads, in pertinent part:

> We are providing pollution liability coverage for this assured through a ... Marine Package Policy No. 10 OM 507066.... The intent is to provide liability coverage resulting from gradual pollution.
>
> *Although we have insured this risk since 1977,* we have never obtained specific underwriting information regarding this exposure. We are, therefore, requesting Loss Control to assist in evaluating this risk.

B45 (emphasis added by the Court). What follows is a list of requested underwriting information that appears to concern land-based pollution such as site plans, pipeline layouts, and tank integrity testing. *Id.*

This document is not as compelling as the insureds wish to portray it. The first quoted sentence does not specify whether the insured pollution risk is that which might arise from one of the specific activities in part two, or whether it is comprehensive. The second sentence appears to refer to the coverage proposed in the future, which, given the date of the document, would involve Ultramar alone. It is significant that the referenced policy, number 10 OM 507066,[18] is not one of the policies that covered Pittston; indeed it appears nowhere in the record. This makes the statement "We have insured this risk since 1977" of questionable relevance, as it may refer to some completely unrelated policy. Even assuming that the underlined passage referred to prior coverage of Pittston, the problem is with the generic use of the phrase "this risk." "This risk" may as easily refer to Pittston as a whole, or Pittston with

regard to its marine risks. It is by no means clear that the writer was referring to land-based pollution risk when he mentioned the coverage history in this case.

The author of the letter, Hartford's assistant division manager Alec Biele, testified that his concern for site surveys, tank integrity testing, etc., was based on the need to develop general familiarity with the site, and because a tank or pipeline failure might create an ambiguous coverage situation if oil migrated to the wharf or some other area that was clearly marine. Biele Dep. at A184–88. It is undisputed that Biele's call for underwriting information was never acted upon. Marine Insurers' Response to Plaintiff's 12G Statement ¶ 139; Biele Dep. at 188.

Biele's explanation for the letter is consistent with the text, and is unrebutted by any evidence. Moreover, the fact that no action was taken shows that Biele's assessment of the situation was not considered authoritative. It appears that Biele was still in an orientation period at Hartford. Biele Dep. at 165. These facts, and the equivocal nature of the letter itself, lead the Court to conclude that this document will not create an issue of fact as to the insurers' belief over whether the pollution clause was stand-alone.

Likewise, the insureds' citation to the letter of May 1, 1984, is not decisive. B49. There Hartford voiced its concern over the pollution coverage. Again, this recognition of pollution exposure does not require the conclusion that it was land-based pollution that was contemplated. Indeed the rest of the letter implies to the contrary. The writer discusses the implication for underwriting and premiums of whether Pittston was engaged in marine operations since the sale of Tankport, and whether the insured would resume shipping activities.

Obviously, the claim history of the policies would be significant in ascertaining the parties' understanding of the scope of the pollution clause. Pittston claims that it filed claims against the CMLP policies for "shoreside" pollution on two occasions. Plaintiff's 12G Statement ¶ 145. The record citations

---

**18.** The Court notes with regret that plaintiffs inaccurately quoted this document in their 12G statement, omitting the reference to the policy number. They did so without the use of ellipses or other indication that they were altering the quoted passage.

by the insured do not support their claim that claims were filed, much less paid. *See* Betz Dep. at A146–50; Funke Dep. at A863–65, A1524; Crystal Dep. at A919–20; B30–33, B863–65. On the other hand, the marine insurers cite numerous instances where losses covered under the part two specific grants were submitted to them, but that losses that would have been covered under Pittston's "stand-alone" version of the policy were not submitted to them but were submitted to other insurers. Marine Insurers' Response to Plaintiff's 12G Statement ¶ 145. *Compare* C2906–23 (CMLP loss report for Pittston 1978–81, all of which were claimed under one of the part two, specific grants) *with* B1156 (Protective Insurance Co. loss history report); B27 (claim made to property insurers for loss of oil due to a corroded tank bottom at Pittston site in Quebec); B1192–98 (claim made and settled with Protective Insurance Co. for PCB contamination from waste oil disposal).

■ In the choice of law Opinion, the Court called for evidence of practices in the marine insurance profession concerning the implications of the two part policy structure and the pollution insurance clause. Plaintiff's expert, Stellwag, testified that there were no such customs. Stellwag Aff. ¶ 38. Defendants' expert, Goulding, contradicts this, averring that the outline of general provisions that have no other function than to be incorporated into specific grants of coverage is "the very essence" of how a marine package policy works. Declaration of Jean H. Goulding, dated Sept. 15, 1993. This battle of the experts cannot create a genuine issue of fact over this basically legal question. Although Goulding's is by far the more persuasive testimony, the Court has not relied on it, but has reached a conclusion based on its own review of the documents and the extrinsic evidence.

It is the duty of the Court when faced with a problem of contract interpretation to read the contract as a whole and in such a way that all of its provisions make sense. In this case, the Court believes that section titled "General Policy Terms and Conditions" does not contain grants of coverage, but only defines the type and extent of coverage granted in the section titled "Specific Policy Terms and Conditions." The Court has considered the extrinsic evidence submitted by the parties including the testimony and documents that go to the parties contemporary understanding of the document, and finds that it is insufficient to create genuine ambiguity in the written contract. Furthermore, assuming that the document were ambiguous, the Court finds that the extrinsic evidence in the record either bolsters its initial understanding of the contract, or fails to support the insured's theory.

■ Therefore, the Court will grant summary judgment to the Marine Insurers that, with the exception of the policy numbered DFSJ–100, the CMLP policies do not provide coverage for remediation of the Tankport site. The Court is aware that only the insureds have moved for summary judgment on this issue. However, where the Court is already engaged in the task of determining whether there is an issue of fact, and both parties have had the opportunity to set forth their evidence on the issue, the weight of the authority holds that summary judgment may be granted to a non-movant. *In re Caravan Refrigerated Cargo, Inc.,* 864 F.2d 388, 393 (5th Cir.1989), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990); *SBK Catalogue Partnership v. Orion Pictures, Corp.,* 723 F.Supp. 1053, 1068 (D.N.J.1989); *see Celotex,* 477 U.S. at 326, 106 S.Ct. at 2554 (court has power to grant summary judgment *sua sponte* if losing party on notice that it must come forward with all its evidence). The Court believes the question has been fully joined in the briefs, factual submissions and oral arguments of the parties and that each party is on notice of the dispositive nature of the issue presented here. Therefore, and in light of the fact that contract interpretation is traditionally a matter for the Court, summary judgment will be granted to the non-movant.

■ As to policy number DSFJ–100, the April 1983 to April 1984 policy that names Ultramar as the insured, the Court will deny summary judgment on the stand-alone issue. The same rationale that supports the ruling above, the placement of the pollution clause in the contract, supports the insured's contention that moving the pollution clause to the specific terms and conditions part means

that it was considered to provide stand-alone coverage. The extrinsic evidence showing the heightened concern of the insurers over Ultramar's version of the policy also supports the conclusion that DSFJ–100 was considered a more serious matter than the previous CMLP policies.

Nonetheless, despite the potential existence of stand-alone coverage under DSFJ–100, the Court holds that coverage under that policy is barred by the known loss doctrine. Because the same facts and legal principles control this issue for both DSFJ–100 and Insurance Company of North America's CGL policies, their fate will be discussed together in the section below on the CGL policies. The Court will grant summary judgment to the marine insurers that coverage under DSFJ–100 is barred by the known loss doctrine, and Ultramar's Motion on CMLP policies will be denied. The Certain CMLP Insurer's Motion for Summary Judgment based on known loss will also be denied as moot, although the Court notes that, for the reasons discussed below, the known loss theory would provide an alternative ground for dismissing the case against Pittston's marine insurers.

The remaining CMLP motions will be dismissed as moot. These summary judgment motions are denominated 1) CMLP Insurers' Motion on Non-disclosure 3) Certain Marine Insurers' Motion on No Loss within Policy Period, 4) Certain CMLP Insurers' Motion on ECRA Costs, and 5) Certain CMLP Insurers' Motion on Named Insured.

### B. The Protective Insurance Company's Motion

The Protective Insurance Co., joined by Pittston and Ultramar move for summary judgment that the Protective policies are not policies of insurance and not CGL policies as used in an exclusion within the CMLP policies. The Marine Insurers have made a counterclaim against the insureds that the Protective policies are CGL insurance. Their interest in the issue stems from the fact that a clause in the CMLP policies excludes coverage under any loss for which indemnity is "payable" by a CGL policy.

Because the Court will rule on other grounds that the CMLP policies will not have to respond to this loss, it appears that the marine insurers no longer have an interest in the characterization of the Protective policies, and the Court need not reach this issue.

### C. The Insurance Company of North America ("INA") Motions

#### (i) The Named Insured Issue [19]

█ INA, a CGL insurer from 1983 to 1984, moves for summary judgment that there is no coverage because claimants, Ultramar Petroleum, Inc. and its parent, Ultramar America Limited, (collectively "Ultramar") are not named insureds. INA issued a CGL policy numbered CFG 209883 effective May 23, 1983 to May 23, 1984, *see* C2082II, extended by endorsement to June 30 1984. C2082JJ. INA argues that Ultramar is not covered because it is not a named insured.

The policy was issued one month after Ultramar acquired all the shares of Pittston Petroleum, on May 23, 1983. At the time the Policy was issued, Pittston Petroleum was the named insured. The policy period initially ran from May 23, 1983 to May 23, 1984. During that time, Pittston Petroleum was renamed Ultramar Petroleum, Inc. Ulrich Dep. at A3017–18. By a May 23, 1984 endorsement, the policy period was extended until June 30, 1984. C2082JJ. That endorsement also listed the new name of the company, Ultramar Petroleum Inc., as the named insured.

INA first argues that Ultramar is not covered by the policy, because the named insured is Pittston Petroleum. This claim is clearly in error, because the endorsement indicates that Ultramar Petroleum Inc. is a named insured. Further, the Policy was issued after Ultramar America became the sole stockholder of Pittston Petroleum, and thus, the only corporate change during the policy period was merely a name change.

█ When an acquisition or merger takes place during a policy period, if there is no increase in risk, the corporate successor will

---

19. In light of the Court's ruling on the known loss motion below, the disposition of the named insured issue has no practical effect. It is

reached because Ultramar's status as an insured is a logical threshold to any other issue of coverage.

be entitled to the benefits of coverage. *National Am. Ins. Co. v. Jamison Agency, Inc.*, 501 F.2d 1125 (8th Cir.1974) ("NAIC"). In *NAIC*, Van Dyke La Arc, Inc. was legally dissolved during the policy period and all assets were distributed to its sole shareholder, Capital Systems. *Id.* at 1127. The Court held that Capital Systems was entitled to the benefits of coverage even without the consent of the insurer, as there was "no real change in the ownership of the policy and the insured property, and therefore, ... no effect on the risk and hazard of loss." *Id.* at 1129.

An alternative rationale cited by the cases is that the successor simply stands in the shoes of the predecessor with regard to liability, as well as coverage. *Aetna Life & Cas. v. United Pacific Reliance Ins. Cos.*, 580 P.2d 230, 232 (Utah 1978). In *Chatham Corp. v. Argonaut Ins. Co.*, 70 Misc.2d 1028, 334 N.Y.S.2d 959 (Sup.Ct.1972), the corporate product of the merger of two predecessor corporations was allowed to assert a policy naming one of the predecessors. The court held that "any right belonging to any of the constituent corporations merged together can ·be asserted by the surviving corporation." *Id.* 334 N.Y.S.2d at 961.

■ Given the much broader proposition of law just discussed, it follows a mere name change, which alters neither risk nor transfers liability during the policy period will not defeat coverage under the named insured doctrine. Therefore, it would not bar Ultramar Petroleum from seeking coverage under the policy.

A more difficult question is presented by the argument that Ultramar transferred Tankport between subsidiaries, and that the Ultramar Petroleum that owns Tankport now (hereinafter "New Ultramar") is not the same entity that was formerly Pittston Petroleum (hereinafter "Old Ultramar"). Citing the case law discussed above, the insured asserts that New Ultramar is the successor of Old Ultramar, whereas the insurer contends that the two are unrelated (except for a common parent) and that Tankport was transferred pursuant to a simple sale of assets.

These arguments are strangely at variance with the evidence in the record concerning the corporate succession. The only direct evidence that the parties cite is the deposition testimony of J. Lincoln Hallowell, Corporate Counsel to Ultramar·America. He testified that, after the acquisition of Pittston Petroleum, the shares of another subsidiary called Golden Eagle Oil Company were transferred to the new subsidiary. Hallowell Dep. at A1623. After Pittston Petroleum's name was changed to [Old] Ultramar Petroleum, title to Tankport was transferred to its Golden Eagle subsidiary. *Id.* at A1622. In 1986, Old Ultramar Petroleum was acquired by a company unrelated to this litigation named Atlantic Petroleum. The shares in Golden Eagle were not included in this deal, and thus Old Ultramar's·subsidiary reverted to the parent, plaintiff-intervenor Ultramar America.[20] *Id.* Atlantic Petroleum renamed its acquisition Atlantic Fuels Marketing Corporation and Ultramar America gave Golden Eagle the name [New] Ultramar Petroleum. Thus, the entity that now claims coverage as Ultramar Petroleum is the former subsidiary of the Old Ultramar Petroleum, formerly Pittston Petroleum, which entities were clearly named insureds.

Upon reviewing the policy, the Court discovers that subsidiaries of Pittston Petroleum are included as named insureds. C2082UU. According to the testimony of Hallowell, Golden Eagle was a subsidiary of Pittston Petroleum, a.k.a. Old Ultramar Petroleum, during the policy period.[21] Hallowell Dep. at A1623. Therefore, Golden Eagle is a named insured. At most, the transfer of Tankport from Old Ultramar Petroleum to Golden Eagle was a transfer of a risk between named insureds. For the same rea-

---

20. Another property that Atlantic was not interested in purchasing was also transferred to Golden Eagle. Hallowell Dep. at A1625.

21. This follows from the testimony "After our acquisition of Pittston Petroleum in 1983, the shares of Golden Eagle Oil were transferred to Pittston Petroleum, later named Ultramar Petro-

leum...." Hallowell Dep. at A1623. The name change occurred during the policy period. If Golden Eagle was made a subsidiary of the acquired corporation when it was still named Pittston Petroleum, then one may deduce that Golden Eagle was a subsidiary during the policy period.

son that the name change of Pittston Petroleum to [Old] Ultramar petroleum has no effect on coverage, the name change of Golden Eagle to [New] Ultramar Petroleum does not change the status of this entity as a named insured. It can not reasonably be contended that the nature of the insured risk would be altered in such a situation, or even that it is not covered under the terms of the policy.

The Court is somewhat mystified as to why the parties have chosen to brief this issue on the assumption that Golden Eagle was an unrelated subsidiary of Ultramar America. Of course one possibility is that Hallowell was simply wrong concerning the temporary status of Golden Eagle as a Pittston Petroleum and then an Old Ultramar Petroleum subsidiary. However, the parties have cited no other evidence at all on this point, and it is not for the Court to search the voluminous record without their guidance.

Therefore, the Court will deny INA's motion to dismiss the complaint against them on the ground that plaintiff is not a named insured. Plaintiffs also contend that the parent, Ultramar America, is a named insured by virtue of its status as stockholder of a named insured. See C2082NN (stockholder of a named insured "acting within the scope of his duties as such" is covered). Given the Court's finding that both New and Old Ultramar Petroleum are named insureds, the Court finds that the parent company is also a named insured.

### (ii) The Fortuity, Known Loss, and Loss in Progress Issue

■ Each of the insurers in this case have moved for summary judgment on the ground that coverage is barred by the Fortuity, Known Loss and Loss in Progress doctrines. Travelers motion was discussed above in the section addressing its CGL policies. It is moot with regard to the CMLP policies except for policy number DSFJ–100. As to DSFJ–100 and the INA CGL policies, in both cases the policy periods begin at the same time and cover the same insured, Ultramar. Therefore, the facts as well as the legal principles will be the same as to each type of policy, and they will be considered together here.

The insurance law doctrines of fortuity, known loss and loss in progress proceed on the unexceptional proposition that the nature of the insurance bargain is to exchange a risk of loss for the certainty of a premium. Where the risk of loss has matured into a certainty, there is no more risk to be insured. *Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56, 63 (3d Cir.1982). A narrower question is presented on this motion upon which two competing theories vie for the Court's approval. The insureds assert that the loss is not known until the legal liability for the underlying property damage rises to a certain level of certainty. The insurers contend that knowledge of the underlying damage removes the element of risk and makes the loss uninsurable.

The weight of authority appears to favor the insurers' position. Commentators have recognized that, with the introduction of the occurrence-based liability policy, the "expected nor intended" definition of occurrence incorporated the traditional known loss doctrine that had previously been implied in the nature of the insurance contract. Ostrager & Newman, *supra*, § 8.03[a] at 275–76.

The Third Circuit has been in accord since *Appalachian Ins. Co.*, 676 F.2d 56 (1982). There the Court of Appeals treated the concepts interchangeably when it found that to extend the duration of an occurrence past the point of manifestation of the injury "would contravene the rule that an insured cannot insure against something which has already begun." *Id.* at 63. Other courts in this state have done the same, ruling that the known loss doctrine operated upon knowledge that the insured was causing environmental damage and therefore "subsumed within the issue of whether there was an 'occurrence.'" *Continental Ins. Co. v. Beecham, Inc.*, 836 F.Supp. 1027, 1045 (D.N.J.1993) (Barry, J.); *Marotta Scientific Controls v. RLI Ins. Co.*, Civ. No. 87–4438, slip op. at 5 (D.N.J. Feb. 25, 1988) (Bissell, J.); *Morton Thiokol, Inc. v. General Accident Ins. Co.*, Civ. No. C–3956–85, slip op. at 18 (N.J. Ch. Div. Aug. 27, 1987).

The Appellate Division recently appeared to conflate the three doctrines with the concept of "expected nor intended" in its opinion in *Astro Pak Corp. v. Fireman's Fund Ins. Co.*, 284 N.J.Super. 491, 498, 665 A.2d 1113

(App.Div.1995). The Court quoted *Jackson Township v. Hartford Accident & Indemnity Co.*, 186 N.J.Super. 156, 451 A.2d 990 (Law Div.1982), as a forerunner of *Morton*, to the effect that:

> [A]n 'industrial enterprise who discharges, disburses or deposits hazardous waste material knowing, or who may have been expected to know that it would pollute, will be excluded from coverage by the [expected nor intended] clause.' This expression notes that coverage exclusion relates not to the depositing of the waste material but the knowledge that it would pollute. So too with the 'known loss' or 'loss in progress' doctrines.... [T]he 'loss' must relate to a known occurrence that would trigger indemnification by the insurer. Only if [the insured] knew that its acts had already subjected it to potential liability because of leakage into the surrounding land, water or air, would the insurers have a claim to a defense.

284 N.J.Super. at 498, 665 A.2d 1113.

The insureds attempt to distinguish the thrust of this authority, arguing that many of the cases decided under known loss involve situations where litigation has already commenced, or a clean-up order has been received by some governmental authority. *E.g., Marotta,* Civ. No. 87–4438 (D.N.J. Feb. 25, 1988); *Township of Gloucester v. Maryland Casualty Co.,* 668 F.Supp. 394, 402–03 (D.N.J.1987). Indeed, *Astro Pak* rejected the insurer's known loss defense because the statute on which the underlying liability was based, CERCLA, had not been enacted and "there was no actual or constructive knowledge of an insured claim against [the insured]." 284 N.J.Super. at 499, 665 A.2d 1113.

While it is obvious that receipt of formal notice of legal liability for environmental damage would provide powerful, and possibly dispositive evidence of knowledge of the loss, it does not follow that this is the only way knowledge of the loss may be acquired. Cases that hold that the commencement of litigation means that the loss is known, do not compel the conclusion that the loss may not become known earlier.

Moreover, the language of the cases cited by the insureds reveals that those courts were basing their holding on notice of environmental damage or occurrence, rather than certainty of liability. *Township of Gloucester v. Maryland Casualty Co.,* 668 F.Supp. 394, 402–03 (D.N.J.1987) (coverage barred where insured had "actual knowledge of the occurrence prior to the ... policy period"). *Appalachian Ins. Co.,* 676 F.2d 56, is ambiguous. Even though an EEOC complaint was filed a few months before the policy began, the court's holding on known loss rested in part on the fact that the effects of the insured's discriminatory practices were felt at the time they were promulgated. *Id.* at 63.

■ It is the Court's opinion that any uncertainty in the cases over the two theories presented here is best resolved by the common sense observation that some harm so clearly will result in legal liability that knowledge of the harm may be presumed to constitute knowledge of the insured liability for the purposes of the known loss theory. In this day and age, massive environmental damage on a site owned by the insured is such a harm, and the cases addressing the known loss theory have recognized this fact even if they do so *sub silentio*. On the other hand, a polluter who believes it is disposing of waste properly, only to become subject to liability pursuant to a later change in the law that dramatically extends the circle of responsibility, *see, e.g., Astro Pak,* might not have notice of the loss until formal notice was received.

■ Ultramar cannot reasonable maintain that, in 1983, knowledge of extensive groundwater contamination of a site they were proposing to acquire would not result in liability for cleaning it up. Thus, at least on the facts of this case, the known loss theory and the "expected nor intended" analysis are parallel, and the factual question is what Ultramar knew concerning the condition of Tankport on the date it purchased the policies from INA (and the CMLP insurers).

This case presents facts similar to those before Judge Barry in *Beecham,* 836 F.Supp. 1027. There the question was whether a company that had acquired a site that was already polluted was barred by the expected or intended clause or the known loss doctrine from collecting on its CGL policy. The Court ruled that the standards were the same and discussed the evidence concerning

the insured's investigation before it purchased the site and denied summary judgment in the face of conflicting evidence over what the purchaser knew and when the purchaser knew it. *Id.* at 1044.

Here too, the issue is what Ultramar knew before it purchased the site.[22] INA proffers evidence that Ultramar officials John Davies and Malcolm Haigh inspected the site prior to the sale, accompanied by Pittston's Foster. Notes these gentlemen took at the time appear in the record. They indicate that the site had "1½ miles long, rusty pipelines" and that the site was "generally very poor (old)." C2804 Haigh testified that Pittston advised them of "deficiencies" at Tankport. Haigh Dep. at A1584–85. This evidence falls short of showing that Ultramar had a subjective awareness of ongoing contamination.

However, Foster told Davies and Haigh that there was "known groundwater contamination." Haigh Dep. at A1598–99, A1606. In his report to his superiors dated April 22, 1983, Haigh wrote that, in addition to the tanks out of service due to corroded bottoms:

> The very high water table causes further problems and there is known ground water contamination which will take an estimated $500 M to correct.... City and State authorities have expressed a desire to clean up the waterfront and proposed cluster housing plans suggest this pressure will increase. There is no fire protection system and no oil/water separator facility.... There must be better alternatives to supply New Jersey markets in today's operating climate and this plant must be considered as a liability we did not create and do not need to take or perpetuate.

B874. Ultramar Vice-president Dale Austin testified that he was aware of the ongoing oil seepage problem. Austin Dep. at A11. INA also cites the indemnity provision for environmental damage in the stock purchase agreement between Pittston and Ultramar as evidence of Ultramar's awareness of the pollution at Tankport.

The foregoing is direct evidence that Ultramar had a subjective awareness of ongoing environmental damage at Tankport before the acquisition and before the INA policies were purchased. It amounts to the "smoking gun testimony" that the *Morton* court feared would be so hard to come by. 134 N.J. at 85–86, 629 A.2d 831. Thus, the Court need not engage in an analysis of the other *Morton* factors concerning objective evidence of intent needed to establish that environmental damage was expected or intended.

The insured's response to this is not successful. They claim that Haigh and Davies' short visit was not enough to give them notice of the loss. However, the record shows that Foster himself told the Ultramar officials of the environmental damage. It has already been shown that Pittston officials expected or intended the damage, and there was ample time to pass the fatal knowledge on to the Ultramar representatives.

The insureds also argue that the insurers knew or must have known of the environmental contamination, and so should be estopped from raising the known loss defense. The record does not support this claim as a factual proposition. There is no showing that INA knew of the damage before issuing the policy. The fact that the CMLP insurers underwrote the site for five years before Ultramar come on the scene does not, as the insureds claim, provide positive evidence that they knew of the environmental condition of the site. Indeed, the Court has ruled they did not provide coverage for land-based pollution before the DSFJ–100 policy; thus, there is no reason why they should have known.

Finally, the insureds claim that the insurers knew of the indemnification provision in the stock purchase agreement and so should equally be charged with the same notice as the insureds. However, the fact that the insureds were the parties to the agreement and drafted the indemnification agreement between them, means that the provision is a far more probative indicator of their knowledge of environmental damage than for the insurers.

Accordingly, the Court will grant summary judgment as to INA and Ultramar's CMLP

---

22. INA rehearses at length evidence that it claims shows that Pittston knew of the environmental damage at Tankport. The issue here, however, is whether INA's insured, Ultramar, knew of the loss.

insurers' policies on the basis of known loss. It appears that Ultramar went into the Tankport acquisition with its eyes wide open as to the existence of an ongoing problem with groundwater contamination. Therefore, Ultramar would be found to have "expected" the damage within the meaning of the "expected nor intended" clause, and coverage is precluded under the known loss doctrine.

## CONCLUSION

For the reasons stated, the Court will make the following provisions:

The motion to strike declarations will be granted in part and denied in part. The declaration of Curtis Meanor will be struck from the record. The declaration of the expert John B. Robertson will not be struck.

The cross-motions for summary judgment will be denied with regard to the Travelers CGL policies for policy years that began before the date of the Environics report. The Court will grant Travelers' motion for summary judgment for its CGL policies for years that began after the date of the Environics report on the ground that, after that date, the insured expected or intended the environmental damage for which it seeks coverage. Summary judgment will be granted to Travelers on the issue of defense costs incurred by Pittston before April 4, 1990.

The Court will grant summary judgment to the marine insurers on all of the CMLP policies. As to all the CMLP policies except policy number DSFJ–100, the Court finds that coverage is precluded by the language of the insurance contract. As to DSFJ–100 the Court finds that coverage is barred under the doctrine of known loss. The complaint against the CMLP insurers will be dismissed with prejudice. The Court will grant summary judgment to Insurance Company of North America concerning its CGL policies for which Ultramar is the named insured, on the ground that coverage is also barred under the doctrine of known loss. The complaint against INA will be dismissed with prejudice.

The sixteen motions and cross-motions disposed of here have generated an extraordinary number of submissions in support and in opposition. The parties considered it proper to submit a steady stream of supplemental authorities and arguments until the Court put an end to them by its letter dated August 16, 1995. Often, counsels' citations to the record in this matter may be described generously as aggressive. Space and judicial resources have not permitted the Court to discuss every argument and citation brought to its attention. The parties may rest assured, however, that each has been considered by the Court and given the weight it deserves in shaping this decision.

## APPENDIX

The following is intended only as a guide to the reader. It is based solely on the representations of counsel and does not constitute the finding of the Court.

| | |
|---|---|
| Biele, Alec– | Hartford Ins. Co. Assistant Division Manager Feb. to June 1984 |
| Betz, John– | Fred S. James & Co. Vice President of Production 1977–84 |
| Cacici, Joseph– | Fred S. James & Co. Vice President Hull Dept. 1978–80 |
| Clark, John– | Tankport Employee 1957–86 |
| Coleman, David– | Metropolitan Petroleum Manager of Terminal Operations 1966–83 |
| Crystal, John– | Fred S. James & Co. Senior Broker Hull Department 1980–89 |
| Dalton, Thomas– | Metropolitan Petroleum Petrochemical Co. Vice President and General Manager 1972–77 |
| Davies, John– | Manager of Ultramar's Ontario Operations 1980–89, Inspected Tankport in 1983 |

Foster, Joseph– Tankport Superintendent 1956–61; Metropolitan Petroleum and Ultramar Petroleum Vice President of Operations 1961–88

Fred S. James & Co.– Insureds' marine insurance broker

Funke, William– Hartford Ins. Co. Supervising Underwriter 1982–84

Haggerty, David– Wausau Comptroller 1970's–'80's

Hallowell, J. Lincoln– Ultramar Vice President and Corporate Counsel 1982–91

Kaulakis, A.F.– Pittston Vice President of Energy Development 1972–78; Chairman and CEO Metropolitan Petroleum 1977–83

Lennon, Frank– Pittston Vice President of Risk Management and Insurance 1977–87

Mannion, William– Metropolitan Petroleum President 1977–84

Metropolitan Petroleum– Pittston affiliate that operated Tankport, a.k.a. Tankport Terminals, Inc. a.k.a. Pittston Petroleum, Inc.

Mootz, Ernest– Metropolitan Petroleum Engineer 1963–86

Robertson, John– Hydrogeologist, Defendants' Expert Witness

Shivey, William– Employee at Tankport in various position from 1942–63; Superintendent of Tankport 1963–78

Stendardi, Paul– Superintendent of Tankport, 1979–84

Suler, Dennis– Killam & Assoc. (Ultramar's Environmental Consultant) Hydrogeologist

Ulrich, Tim– Metropolitan Petroleum and Ultramar Petroleum In-house Counsel 1981–84

LEGEND

∩●● = Tankport Boundary

= Oil Tank

UPPER BAY OF NEW YORK

N

CAVEN CREEK

CAVEN POINT ROAD

CAVEN CREEK

Oil/Water
Separator

TO EXIT 14B

N.J. TURNPIKE

TANKPORT TERMINAL
Jersey City, N.J.